WILLIAM W. WORSLEY and another, v. THE SECOND MUNICIPALITY OF NEW-ORLEANS.

The ordinances of the Council of the Second Municipality of New-Orleans, of the 23rd and 30th June, 1842, imposing a wharfage charge on all packages landed in or shipped from the limits of the Municipality, do not conflict with the provisions of the constitution of the United States which give Congress the power to regulate commerce with foreign nations and among the several States, and with the Indian tribes, and declare that no tax or duty shall be laid on articles exported from any ·State, and that no State shall, without the consent of Congress, lay any imposts or duties

on exports, except what may be absolutely necessary for executing its inspection laws.

The constitution of the United States never intended to give Congress authority to interfere with the laws of the States, in relation to the ordinary facilities afforded to commerce in the shape of wharves and other instruments or means of trade, and in the preservation of harbors and the keeping open of rivers.

An *impost, tax,* or *duty,* is an exaction to fill the public coffers, for the payment of the debts, and the promotion of the general welfare of the country. A retribution provided to defray the expense of constructing bridges or causeways, or removing obstructions, in a water course, to be paid by those only who enjoy the advantages resulting from such expense, is neither an impost, tax, nor duty.

Where expensive improvements highly beneficial to commerce, have been made on the banks of a river, by the corporation of a city, under the powers conferred by its charter, though their construction, at least to the extent to which they were made, was not imposed as a duty, one, who has voluntarily paid an assessment levied by the ·corporation on merchandise or other articles imported into or exported from the place, to defray the expense of their erection and maintenance, cannot recover back any amount so paid, though the city may have had no legal right to levy such assessment, or to enforce its payment. Having derived benefit from the improvements, and knowing when the amount was paid that it was in the nature of a remuneration for the use of such works, there was a natural obligation to pay, and equity forbids that the amount should be recovered. The mere right to withhold payment, does not necessarily imply a right to recover back what has been paid. If the party receiving the amount may conscientiously retain it, on account of any natural obligation on the part of the person making the payment, the latter cannot recover it. C. C. 1751, 1752, 2280, 2281.

APPEAL from the Commercial Court of New-Orleans, *Watts,* J.

The petition alleges that the plaintiffs had paid to the Second Municipality of New-Orleans, between the 11th July, 1842, and the time of instituting their suit, the sum of $393 45, as a tax on goods, wares and merchandise, received by the petitioners from different western states, on their introduction into the said Municipality, and upon goods so received and subsequently exported by them from the port of the Municipality to foreign parts, or to other states, which tax, it is alleged, was exacted under the provisions of two ordinances of the Municipality, of the 23d and 30th of June, 1842. The petitioners aver, that at the time of making said payments, they believed themselves bound so to do, but that they have since been advised that they were not so bound, and that the payments were made in error ; that the said ordinances are illegal and contrary to the laws of this State, as

well as in violation of the laws of the United States. They claim the repayment of the money, with interest from the date of the payments.

The defendants answered by a general denial. The ordinances were introduced in evidence.* The payment of the

---

*The ordinances of the Municipality, under which the collections were made, are in the following words:

[No. 410.]

THE COUNCIL of Municipality Number Two, of the city of New-Orleans, ordains as follows:

Art. 1. That the following wharfage shall be imposed on, and exacted from all and every description of packages, &c., which may be landed in, or shipped from the limits of this Municipality:

|  | INWARD. | OUTWARD. |
|---|---|---|
| On each bale of cotton, hay or moss, | 6 CTS. | 6 CTS. |
| On each hogshead of sugar, | 10 | 10 |
| On each hogshead of tobacco, | 12½ | 12½ |
| On each 1000 feet of lumber, or 1000 of staves, | 12½ | 12½ |
| On each bbl. of flour, whiskey, molasses, spirits of any kind, beef, pork, potatoes, onions, lime, or other articles packed or contained in barrels, except lead, iron, or other articles of great weight, | 3 | 3 |
| On each cask of bacon, hams, &c., | 6 | 6 |
| On each ton of pig lead, pig iron, iron and copper nails, iron articles, coal, salt, slates, flagstones, bricks, paving, curb and gutter stones, sand and ballast, or other articles of great weight, computing the ton at 2000 pounds, | 15 | 15 |
| On each keg of lard, butter, &c., | 1 | 1 |
| On each firkin of do., | 2 | 2 |
| On each piece of bagging, coil of bale rope, packing yarn, &c., on each pack or small truss of skins, sack of corn, corn meal, oats, bran, or other grain, | 2½ | 2½ |
| On each crate of earthen or stone ware, | 10 | 10 |
| On each crate of bottles, | 5 | 5 |
| On each bale of blankets or articles packed in bales, or cases of the bulk and weight thereof, (say 400 lbs.), | 6 | 6 |
| On each box of tin plate, | 2 | 2 |
| On each bale, box, case, truss or other package, of less weight and dimensions than a bale of blankets, including soap, fish, candles, | 4 | 4 |
| On each pipe of wine, brandy, or other liquors, exceeding sixty gallons, | 25 | 25 |
| On each cask of wine, brandy, or other liquors, of sixty gallons, or less, | 12½ | 12½ |

DECEMBER, 1844. 327

Worsley and another v. The Second Municipality of New Orleans.

amount sued for was admitted; and that the packages on which it was levied were unbroken at the time of landing them on the

| | INWARD. | OUTWARD. |
|---|---|---|
| On each basket or box of wine, cordials, liquors and oil, containing one dozen bottles,............................................................ | 2 CTS. | 2 CTS. |
| On each case, basket or box of wine, cordials, liquors, oil, &c., containing more than one dozen bottles, then in proportion to that excess, (say 2 cents per dozen),............................................ | | |
| On bulk pork, per ton of 2000 lbs.,....................................... | 15 | 15 |
| On each case of copper,........................................................ | 8 | 8 |
| On each bag of coffee,........................................................... | 3 | 3 |
| On each box of sugar,........................................................... | 10 | 10 |
| On each empty hogshead, tierce, bundle of chairs, buckets, &c.,.... | 3 | 3 |

All packages of merchandise not particularly described in the foregoing tariff, shall be charged with wharfage duty as near as may be in conformity with the provisions of this ordinance, and on the scale therein specified, to wit, at the rate of three cents, for every four cubic feet.

Art. 2.    That the foregoing rate of wharfage duties, shall be paid and collected in the following manner, viz:

### INWARD CARGO

That so soon as any sea vessel, steamboat, flatboat, or other vessel, shall arrive and be moored in the port for the purpose of discharging therein, said vessel shall be visited by the proper officer or collector for the Municipality, who shall require and be empowered to demand from the captain, consignee or owner, to lay before said officer a true and correct original or copy of the manifest of the cargo, from which document such officer shall proceed forthwith to extract a summary statement of all the articles or packages on board, examine the same with said captain or consignee, who shall sign the same as being correct, and then he shall make out a bill for the amount of said wharfage duty, according to the preceding tariff, demand and receive payment thereof from said captain, owner or consignee.

### OUTWARD CARGO.

Art. 3.    That so soon as any such vessels, steamboats, or other craft has completed her outward cargo, and before she proceeds on her voyage, the collecting officer of the Municipality shall immediately proceed on board, have reference and make extracts from her manifest in the manner set forth in article No. 2, but always subject to the like certified examination of the same by the captain, owners or consignee, and shall demand and collect the amount of said wharfage duty from said captain, owner or consignee, as described in said article No. 2.

Art. 4.    On Saturday of each week, the proper officers or collectors of the Municipality shall make their returns to the Comptroller; and at the same time deposit in his hands the certified summary manifests referred to in the previous articles, numbers two and three, and immediately pay over the amount collected to the Treasurer.

Art. 5.    That in the event of any captain, consignee or owner of such vessel, steamboat or other craft, refusing to pay the wharfage dues above specified, when thereunto

wharf, or at that of the payment of the tax. It was also admitted that the wharves were built by the defendants, and that

demanded, or make false returns of their respective cargoes, or in any manner deceiving or attempting to deceive the collecting officer, or in any manner impeding him in the performance of his duties, as designated in the ordinance, he or they shall be prosecuted on the sworn evidence of such officer, not only for the recovery of said wharfage duty, if not paid, but also for the recovery of a fine not exceeding one hundred dollars for each contravention, the same to be recovered and executed before any court of competent jurisdiction, for the benefit of the Municipality.

Provided, That all and every description of baggage and fire wood shall be exempt from the operation of this ordinance.

Provided, That this ordinance shall take effect on the first day of July next, in case Municipalities Nos. 1 and 3 shall agree thereto.

Passed, June 21, 1842.                       J. BALDWIN, Recorder.


Approved, June 23, 1842.                       D. PRIEUR, Mayor.


[No. 415.]

AN ORDINANCE, providing for the collection of wharfage on articles landed in and shipped from the Second Municipality.

Art. 1.   Be it ordained, That the collection of the wharfage dues on articles landed in and shipped from the Second Municipality, shall be made by three collectors, to be to be elected by ballot by the Council, viz: one collector for the shipping, one for steamboats, and one for flatboats and all other craft.

Art. 2.   Be it further ordained, That each of said collectors shall have full authority to appoint as many assistant collectors to aid him in the performance of his duties as he may from time to time find necessary, he being responsible for the faithful performance of their duties ; such assistant collectors shall have full power to demand and receive the amount of wharfage, with the collection of which they may be charged by the collector, and their compensation shall be fixed and paid by said collector.

Art. 3.   Be it further ordained, That in full compensation for the collection of these wharfage dues, each collector shall be allowed five per cent on all monies received by him and paid into the Treasury, and each of said collectors shall furnish to this Council a bond, in the sum of five thousand dollars, with two sufficient securities, to ensure the punctual payment to the Treasury of all sums collected by him or his assistants.

Art. 4.   Be it further ordained, That two and a half per cent shall be allowed to all masters of vessels, steamboats and other craft, or to consignees of such vessels, steamboats, &c., on their paying the amount of wharfage for which they are liable

the landing and shipping of merchandize has been greatly facilitated thereby; that they do not extend further into the river, than is necessary to afford accommodation to the commerce of the city; and that the packages mentioned in the petition were conveyed across one of the wharves on the Mississippi, within the limits of the Second Municipality.

It was shown by a certificate of the comptroller of the Second Municipality that the amount expended by the Municipality, from May, 1836, to June, 1842, for the construction and repairs of wharves and levées, was $484,302 72; and for paving and repairs of streets, during that period, $1,360,008 99. There was a judgment below in favor of the plaintiffs for $323 45, with interest at five per cent, from the 25th of March, 1843, till paid. The defendants appealed.

*Cooley,* for the plaintiffs. The power to regulate commerce is exclusively vested in Congress by the Constitution of the United States. See art. 1, sec. 3, § 8. Story's Comm. on the Const., vol. 2, p. 512, § 1063–1067. Rawle on the Const. Ed. 1839, pp. 81, 82, 83 and 84. Wheaton's Rep., vol. 9, pp. 199, 200, 201. Peters' Rep., vol. 11, pp. 157, 158, 159. Ib., vol. 15, p. 504 (Judge McLean); 511 (Judge Baldwin). Kent's Com., vol. 1, pp. 436, and 439 in note. Tucker's Blackstone, vol. 1, part 1, app. D., p. 180.

The object of giving exclusive power to the general government to regulate commerce among the several States, was precisely to obviate all the difficulties, contests and conflicting regulations of the several States; and was one of the main reasons of the adoption of the Constitution. See Mr. Madison's Resolution, Laws U. S., vol. 1, p. 53. Resolution of the Virginia House of Delegates, Ib., p. 54. The Madison Papers, vol. 2,

---

under the ordinance, " Imposing a wharfage tax on all and every description of packages, &c., landed in or shipped from the limits of this Municipality," said allowance being made as a compensation to such master or consignee, for collecting the wharfage from the owners of their cargoes or the consignees thereof.

Passed, June 28, 1842.        J. BALDWIN, Recorder.

Approved, June 30, 1842.        D. PRIEUR, Mayor.

pp. 691, 692, 695, 711; and vol. 3, 1445 and 1446.    The Federal-
ist, No. 7, p. 33 ; No. 22, p. 105 ; No. 42, p. 211.    Wheat., vol. 12,
pp. 445, 446.    Story on Const., vol. 1, p. 239 ; vol. 2, p. 473.
Wheat., vol. 9, p. 224.

Taxation may interfere with the power to regulate commerce.
Wheaton's Rep., vol. 4, p. 425 *et seq ;* vol. 12, pp. 448, 449.

No State can lay any duties or imposts on imports or exports.
Const. U. S., art. 1, sec. 10, No. 2.    Wheat., vol. 12, p. 439, 440.
Story's Comm. Const., vol. 2, pp. 515, 516.

The only wharfage tax sanctioned by Congress, was that
*which was usual and existed when Louisiana was acquired* (Story's
Laws U. S., vol. 2, p. 912) ; and that was charged only on *the
vessel.*

5. In the admission of Louisiana into the Union, it was a fun-
damental condition that the navigation of the Mississippi should
be free from any *tax, toll, impost or duty.*    Story's Laws U. S., vol.
2, pp. 1184, 1224.    The river includes the levée.    Civ. Code, arts.
446, 448, 449.    *Morgan* v *Livingston,* Martin, vol. 6, p. 229, and
the authorities there quoted.

6. Even if the State had the power to exact wharfage on mer-
chandize imported into the city, it has never granted such a
a power to the city or to the municipalities.    It is expressly pro-
hibited to them.    Civ. Code, arts. 442, 443, 444, 446, 448, 449.
*Pulley* v. *Municipality No.* 2, 18 La. p., 278.

7. *"A power of so extensive a kind, which is liable to great abuse,
and which might produce such disagreeable collisions between the
different States, should be shown to be expressly given."*    Judge
Porter, in the case of *Fagot* v. *Gradenigo,* 3 La., p. 13.

8. If the legislature had intended to grant such a power, it is
obvious that it would have been given to the General Council ;
yet the act of 1836 which divided the city into municipalities
and created the General Council, gives them power to tax *ves-
sels* only.    Acts of 1836, p. 33, sec. 11; and p. 36, sec. 20.

9. It was contended in the court below, that the wharfage
charged is not a *tax.*    It has every characteristic of a tax.    It is
imposed by a political corporation, by a regular ordinance ; and
instead of purporting to charge for the use of the wharves, it
charges wharfage *on all goods landed in the Municipality, or ship-*

*ped from it.* The testimony, as well as the localities which the court is perhaps bound to notice, show that in many cases the wharves are not used at all in loading, or discharging goods into the municipality. See *Mayor* v. *Oakey*, 11 La. p. 15.

10. As to the right of plaintiffs to recover back what was paid in error, see Civil Code, arts. 2279, 2280, &c. Toullier, vol. 11, Nos. 63–69, 70, and 71. La. Rep., vol. 2, p. 128. Paillet, 1376, 1377, and 1378, note A, No. 2. Duranton, vol. 7, p. 493 ; and vol. 6, No. 127. Sirey 27, I, 350, Journal du Palais, vol. 21 (24 Jan. 1827), p. 78. D'Aguesseau, Œuvres, t. 5, p. 475.

*W. S. Upton* and *Eustis*, on the same side.

*Rawle*, for the appellants. A city corporation has the right to construct works in the bed of the river. Civil Code, art. 859. The Municipalities of New Orleans have all the rights incident to a corporation. Act of 1836, sects. 4 and 11. 2 Mart. Hist. of La.

The imposition of toll, or a charge for landing goods on a wharf, is not unconstitutional.

The *duty* which the States are prohibited from laying, is for *importation*, and is not the remuneration which is to be paid for the use of wharves, bridges, roads, &c. Const. of U. S., art. 1, sect. 10. *State* v. *Orleans Navigation Company*, 11 Mart., 322. *Gibbons* v. *Ogden*, 9 Wheat, 1. *New York* v. *Miln*, 11 Peters, 102. Story on Const. No. 183, 353. Arts. Confed., No. 1. *Willson* v. *Blackbird Creek Company*, 2 Peters.

*R. Hunt*, and *Soulé*, on the same side.

BULLARD, J. The plaintiffs sue to recover back from Municipality No. Two, about three hundred and ninety-three dollars, which they allege they paid, at different times, as a tax on goods, wares and merchandise, which they had received from the State of Missouri, and other western States, on the introduction of the same within the limits of said Municipality, and upon goods so received, which were exported by them from the port of said Municipality. That these taxes were collected in virtue of certain municipal ordinances, and that in making said payments, the plaintiffs believed that they were bound to do so ; but that they have since been advised that said Municipality has not, and had not, at the time, a legal right to impose and collect such a tax ; and that, consequently said payments were made in error.

The defendant answers by a general denial, and averring that the plaintiffs have shown no cause of action.

The ordinance charged to be illegal and to have been ordained without sufficient authority, is that of the 23d of June, 1842, imposing, what is called wharfage, upon all and every description of packages, &c., which may be landed in, or shipped from the limits of the Municipality.

It is admitted in the record, that the packages mentioned in the plaintiffs' bill, were conveyed on, and across one of the wharves on the river Mississippi, within the limits of the Municipality. That the wharves were built and paid for, either by the corporation of New Orleans, or by said Municipality. That the landing and shipping of goods and merchandise, has been greatly facilitated by means of said wharves; and that they do not extend further into the river than is required to afford the facilities above mentioned.

The illegality of the ordinance is asserted on two distinct grounds: *first*, that it is in violation of the constitution of the United States; *secondly*, that, even supposing that the ordinance does not conflict with the constitution, yet the Municipality is without authority granted to it by the legislature, to impose and levy such a tax. It is under this double aspect we proceed to examine the case.

I. It is said in argument, that the ordinance conflicts with those provisions of the federal constitution, which give to Congress the power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes; which declare that no tax or duty shall be laid on articles exported from any State, and that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

If the wharves built and kept up by the Municipalities at such vast expense, had been erected by and belonged to the State, as administrator of the port of New Orleans for the use of the public, instead of the city, we could not entertain any doubt of its constitutional right to impose the wharfage in question. The authorities and adjudged cases, which we have had occasion to

examine in the course of the investigation of the present case, and that of *The State* v. *Fullerton*, lately decided, have satisfied us, not only that there is no regulation of commerce established by Congress, which conflicts with this ordinance, but that the constitution never intended to give Congress authority to interfere in relation to those ordinary facilities afforded to commerce, in the shape of wharves, and other instruments or means of trade, as mentioned particularly in the case of the *City of New York* v. *Miln*, and among the rest, the preservation of harbors, of wharves, the keeping open of rivers, as subjected to the State laws. 11 Peters, 143. But the Supreme Court of the United States were still more explicit on the subject, in the case of *Gibbons* v. *Ogden*. They say, " as to laws affecting ferries, turnpike roads, and other subjects of the same class, so far from meriting the epithet of commercial regulations, they are in fact commercial *facilities*, for which, by the consent of mankind, a compensation is paid, upon the same principle that the whole commercial world submit to pay light money to the Danes." 9 Wheaton, 235.

These distinctions were recognized more than twenty years ago by this court, in the memorable case of *The State* v. *The Navigation Company*. The freedom of navigation, it was then said, which was contended for, is not incompatible with certain regulations. " It is not so absolute as to be inconsistent with submission to ferriage laws, giving to citizens residing within or without the territory, the convenience of finding, at suitable places, at all times, and for a fixed compensation, the means of crossing ; nor with quarantine laws, which forbid the advance, in the midst of the shipping anchored before a city, of vessels having, or even suspected to have on board persons laboring under a contagious disease, to the danger and terror of its inhabitants." " Nor with submission to a law which provides a compensation for the labor and expense bestowed by an individual, or corporation, on the improvement of the navigation of a water course, attended before with difficulty and danger, to be paid by those, who, by such means, navigate with ease and safety." The court further say, that the words *impost, tax,* or *duty,* " must be confined to the idea which they commonly and ordinarily present to the mind, as exactions to fill the public coffers, for the pay-

ment of the debts, and the promotion of the general welfare of the country ; not to a retribution, provided to defray the expense of building bridges, erecting causways, or removing obstructions in a water course, to be paid by such individuals only as enjoy the advantages resulting from such labor and expense." 11 Mart., 323, *et seq.* This reasoning applies with great force to the case now before us. In most of the States, it is understood that wharves are private property, and are administered by the owners. Here, they are exclusively under the regulation and control of the city authorities, who alone are authorized to construct and to keep them up for the convenience of commerce. The condition of this port would be lamentable indeed, if those facilities were now withdrawn. The expenses of rigging stages, every time a steamboat, or a vessel of any kind, was to be loaded or discharged ; the enormous charges which would necessarily arise, for drayage through the mud and water now covered by the wharves, before reaching the crest of the levée, not to speak of the damage to packages of merchandise so exposed, would more than quadruple those paid, under this ordinance, as a remuneration for the great convenience and accommodation afforded by the present improved system of wharves.

II. The remaining question, to-wit, whether the city corporations have, by their charters, any authority conferred on them by the Legislature, to impose the tax or toll, or by whatever name it may be called, is not so free of difficulty.

The right to *establish wharves*, is expressly given by the Civil Code. " The corporations of cities, towns, and other places may construct on the public places, in the beds of rivers, and on the banks, all buildings and other works which may be necessary for public utility, for the mooring of vessels, and the discharge of cargoes, within the extent of their respective limits." Article 859.

The authority to *regulate*, as well as to make all improvements to the streets, public squares, *wharves*, and other public property, the use of which is now common, is given to each of the municipalities by the act of 1836, dividing the city into three municipalities. See Digest of B. & C., p. 120.

The sixth section of the act of 1805, incorporating the city of New Orleans, gives the city "power to raise by tax, in such manner as to them may seem proper, upon the *real and personal estate within the city*, such sum, or sums of money, as may be necessary to supply any deficiency for the lighting, cleaning, paving and watering the streets of said city, for supporting the city watch, the levée of the river, the prisons, the work houses, and other public buildings, and for such other purposes as the police and good government of the said city may require," &c. Digest, 94.

Here is a very ample grant of power to tax real and personal property ; but we are not ready to say that personal property, *in transitu* through the city, not belonging to the citizens of New Orleans, not composing what is called in the statute, *personal estate within the city*, is liable to be taxed under this grant of power. On the contrary, we think we must look elsewhere for the justification of the city councils in imposing the tax in question.

In enquiring into the true character of the tax, or due imposed by the ordinance, the whole of it ought to viewed together, as well as the circumstances which preceded its enactment. We readily admit the distinction between a *tax* in the ordinary occupation of the word, and a *toll* or contribution which is exacted in consideration of facilities afforded. The distinction is well illustrated in the case, to which our attention was drawn by the senior counsel for the defendants, whose own argument on this point was very able and discriminating, from the 11th volume of Johnson's Reports. It would seem that in New York churches are exempt from taxation. A religious corporation claimed exemption from certain assessments under the law in that city, similar to ours, relating to the opening of streets, asserting that the burden thus imposed was a species of tax. But the Supreme Court of that State held, "that these assessments are intended and directed to be made upon the owners of lots and lands which may receive benefit and advantage by the improvement. The exemption granted by the act of 1801, was in the general act for the assessment and collection of *taxes*, and the provisions of that act all refer to general and public taxes to be as-

sessed and collected for the benefit of the town, county, or state at large.   The opinion gives also legal definitions of tax and talliage by Lord Coke and Lord Holt, which evidently justify this distinction.   11 Johnson, p. 80.

The only statute which has been brought to our notice, or which our own researches have enabled us to find, from which might be inferred, by implication, the authority to impose any such tax, is that of the 15th February, 1808, (See 1 Moreau's Digest, *verbo* Levée), concerning the police of the shores of navigable rivers, and for other purposes.

The fourth section provides, that any person who shall be convicted of having received any compensation for the landing of *any embarcation* before his land, or for any other use permitted by the laws of this territory, which provide that the shores of navigable rivers shall remain free for the common use of all men, shall, far each contravention, be fined in a sum not less than $500 ; *provided* that the present provision shall not be applicable to the *duties* which corporations of cities or towns have a right to establish in their ports."

From the whole tenor of this act it would seem that it was the object of the Legislature, to prevent individuals from erecting any artificial works on the banks of the river, with a view of deriving an emolument from the facility they might afford to the public.   The reservation, therefore, which is made in favor of cities and towns, can hardly be considered as confined to the the tonnage, or anchorage duty established by an ordinance of O'Reilly ; because that was paid by the vessel in proportion to her tonnage, for the privilege of anchoring along side of the levée, and without reference to any other artificial works or facilities than the embankment itself, commonly called the *levée*, and does not contemplate any charge for the landing of cargoes.

The record shows, that between May, 1836, and June, 1842, there had been disbursed by the defendants, for the construction and repairs of wharves and leveés, upwards of four hundred and eighty-four thousand dollars ; and, in the same period, for the paving and repair of streets, upwards of one million three hundred and sixty thousand dollars.

These improvements have greatly facilitated the commerce of

the country, both foreign and domestic. Before the building of those wharves, it was, at times, impossible to land goods there without the use of stages, and few vessels landed there, They are shown to be well adapted to the trade, and not to extend into the river more than is necessary. It is shown that before the wharves were built no shipping went up there, because they could not use the landing.

The authority of the municipality to construct and keep up these works is positively shown. Their authority to regulate them is equally clear. The right to ask a remuneration for the use of them in the shape of a tax upon goods and merchandise landed in the city, rests upon implication; and since the passage of the act of 30th March, 1843, "to define the powers of the corporation of the city of New-Orleans," by which the collection thereafter of such tax, duty, or charge is forbidden, thereby giving a Legislative construction to the different laws relating to the subject, must be considered as no longer existing. Acts of 1843, p. 55.

The question then occurs, not whether the collection of this charge could be legally coerced, but whether, having been paid, it can be recovered back.

Let us simplify the matter. A., living on a water course with miry banks, difficult to ford, obtains permission from the Legislature to build a bridge for the accommodation of travellers. He obtains the permission to build, to keep up and regulate the bridge, but no express authority to demand a toll from travellers. He, however, gives notice that those who pass the bridge must pay a moderate toll. B. passes over and pays; but afterwards, discovering that no positive law had authorized the exaction, sues to recover back what he has paid. Can he recover?

This is the *condictio indebiti* which we derive from the Roman law, with very slight, if any modification. The Civil Code lays down the principle that, "he who has paid through mistake, believing himself a debtor, may reclaim what he has paid. To acquire this right, it is necessary that the thing paid be not due in any manner, either *civilly* or *naturally*." Arts. 2280, 2281.

Among the natural obligations, enumerated by the Code, the first is: "Such obligations as the law has rendered invalid for

the want of certain forms, or for some *reason of general policy*, but which are not in themselves immoral or unjust." Art. 1751. "No suit will lie to recover what has been paid, or given in compliance with a natural obligation." Art. 1752.

The principles which govern this action are developed much at length, and illustrated by various examples, in the 5th title, of the 12th book of the Roman Digest. It is treated as an equitable action, and the plaintiff must shew himself entitled to recover *ex æquo et bono*. It begins by announcing the general principle to be: "*Si quis indebitum ignorans solvit, per hanc actionem condicere potest. Sed si sciens se non debere, solvit, cessat repetitio.*" And here we find, in connection with the doctrine relating to this action, the great rule of natural equity, that no man ought to better his condition at another's expense. "*Hoc naturà æquum est, neminem con alterius detrimento fieri locupletiorem.*" If the party receiving the payment may conscientiously retain it, on account of some natural obligation on the part of the person making the payment, then the latter cannot maintain this action. A mere right to withhold payment does not necessarily imply a right to recover back what has been paid. "*Ex quibus causis retentionem quidem habemus, petitionem autem non habemus: ea, si solverimus, repetere non possumus.*" The mother who had settled a dowry, believing she was bound to do so, was not allowed to take it back. The reason given is: "*Sublatà enim falsà opinione, relinquitur pietatis causa ex quà solutum repeti non potest.*"

The owner of the bridge, in the case supposed, has no right to prevent the traveller from crossing the river, which is public, and free to the whole world; and, perhaps, he has, strictly speaking, no legal right to demand the toll. But the traveller has voluntarily paid it, and has availed himself of the convenience, afforded him by the owner of the bridge at his own expense, by which means the river has been crossed with less risk to the traveller. He cannot recover it back, without violating a rule of natural equity—without enriching himself at another's expense.

We have recently had occasion to apply this great equitable principle to the case of the tobacco inspectors, who received

something over and above what the law allowed for a fee, for their trouble in sampling the article. See *Hills et al.* v. *Kernion et al.*, decided in May last.

In the case now before us, if the act of 1808, coupled with the power to regulate the wharves, and the general power of taxation, did not authorise the municipality to exact the wharfage dues, they at least show, in our opinion, that the corporation had, at their own expense, conferred upon the growing commerce of the country an immense advantage; if those who availed themselves of those advantages, had contracted to pay a certain remuneration for the use of the wharves, such a contract would have rested upon a substantial, equitable consideration, which, not being forbidden by any positive law, might have been enforced. Without any such agreement the tax was paid by the plaintiffs, acting probably as factors for the owners of the goods, and may very conscientiously be retained. If the plaintiffs had invoked the aid of the court, *re integrà*, to prevent this exaction, it is probable, we should have thought ourselves authorised to arrest the arm of the municipal authorities, as without sufficient legal authority to levy and coerce the payment of such a tax. But it has been voluntarily paid—it has gone to relieve the city from a burden created by the construction of these public works for the benefit of commerce. The plaintiffs, and their correspondents, have derived advantage and profit from those expenditures, which the city was under no legal obligation to furnish, to the extent at least that they now exist. They knew when they paid, that it was in the nature of a remuneration for for the use of the wharves; there was a natural obligation to pay; and equity forbids that they should recover it back.

It is, therefore, ordered, that the judgment of the Commercial Court be reversed, and that ours be for the defendants, with costs in both courts.