THE PIQUA BRANCH OF THE STATE BANK OF OHIO, PLAINTIFF IN ERROR, v. JACOB KNOOP, TREASURER OF MIAMI COUNTY.

In 1845, the Legislature of Ohio passed a general banking law, the fifty-ninth section of which required the officers to make semi-annual dividends, and the sixtieth required them to set off six per cent. of such dividends for the use of the State, which sum or amount so set off should be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject.

This was a contract fixing the amount of taxation, and not a law prescribing a rule of taxation until changed by the legislature.

In 1851, an act was passed entitled, "An act to tax banks, and bank and other stocks, the same as property is now taxable by the laws of this State." The operation of this law being to increase the tax, the banks were not bound to pay that increase.

A municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the legislature. But a bank, where the stock is owned by individuals, is a private corporation. Its charter is a legislative contract, and cannot be changed without its assent.

The preceding case upon this subject, examined, and the case of the Providence Bank v. Billing, 4 Peters, 561, explained.

THIS case was brought up from the Supreme Court of Ohio, by a writ of error, issued under the twenty-fifth section of the Judiciary Act.

In the record there was the following certificate from the Supreme Court of Ohio, which explains the nature of the case :

And thereupon, on motion of the defendant, it is hereby certified by the court, and ordered to be made a part of the record herein, that in the above entitled cause the petitioner claimed to collect, and prayed the aid of the court to enforce the payment of, the tax in the petition mentioned, under an act of the General Assembly of the State of Ohio, passed March 21st, 1851, entitled "An act to tax banks, and bank and other stocks,

the same as other property is now taxable by the laws of this State," a certified copy of which is filed as an exhibit in this cause, marked " A.". The said defendant, by way of defence to the prayer of said petitioner, &c., set up an act, entitled " An act to incorporate the State Bank of Ohio, and other banking companies," enacted by the General Assembly of the State of Ohio, February 24th, 1845, a certified copy of which is filed as an exhibit in this cause, marked " B ; " under which act the defendants organized, and became and was a branch of the State Bank of Ohio, exercising the franchises of such bank prior to and ever since the year 1847; and that the defendant claimed that, by virtue of the operation of said act last mentioned, the State of Ohio had entered into a binding contract and obligation, whereby the State of Ohio had agreed and bound herself not to impose any tax upon the defendant, and not to require the defendant to pay any tax for the year 1851, other or greater than six per cent. on its dividends or profits, as provided by the sixtieth section of the said act of February 24th, 1845. And it is further certified, that there was drawn in question in said cause the validity of the said statute of the State of Ohio, passed March 21st, 1851, herein before mentioned, the said defendant claiming that it was a violation of the said alleged agreement and contract between the State of Ohio and the said defendant, and on that account repugnant to the Constitution of the United States, and void ; but the court here held and decided : 1st. That the sixtieth section of said act of February 24th, 1845, to incorporate the State Bank of Ohio, and other banking companies, contains no pledge or contract on the part of the State not to alter or change the mode or amount of taxation therein specified; but the taxing power of the General Assembly of the State of Ohio over the property of companies formed under that act is the same as over the property of individuals. And, 2d. That whether the franchises of such companies may be revoked, changed, or modified, or not, the act of March 21st, 1851, upon any construction, does not impair any right secured to them by the act of 1845, and is a constitutional and valid law. And it is further certified, that the decision of the question as to the validity of the said statute of 1851, was necessary to the decision of said cause, and the decision in the premises was in favor of the validity of said statute. The court do further certify, that this court is the highest court of law and equity of the State of Ohio in which a decision of this suit could be held. And it is ordered, that said exhibits A and B be made parts of the complete record in this cause.

The contents of exhibits A and B are stated in the opinion of the court.

The case was argued by *Mr. Stanberry* and *Mr. Veriton,* for the plaintiff in error, and by *Mr. Spalding* and *Mr. Pugh,* for the defendant in error.

The points made by the counsel for the plaintiff in error were the following:

1st. That the Piquà branch of the State Bank of Ohio is a private corporation.

The principle governing this point is, that if the whole interest of a corporation do not belong to the public, it is a private corporation. Angell & Ames on Corporations, §§ 31 to 36 inclusive; Dartmouth College *v.* Woodward, 4 Wheat. 636; Baily *v.* Mayor of New York, 3 Hill, 531; Bank United States *v.* Planters' Bank of Georgia, 9 Wheat. 907; Miners' Bank *v.* United States, 1 Greene, 553; Bonaparte *v.* Camden & Amboy R. R. Co. 1 Bald. 222.

2d. The act of the 24th of February, A. D. 1845, providing for the creation of this private corporation, became, by its acceptance, a contract between the State and the corporators, which contract is entitled to the protection of that clause of the Constitution of the United States which prohibits the States from passing any law impairing the obligation of contracts.

Angell & Ames on Corp. §§ 31, 469, 767; Dartmouth College *v.* Woodward, 4 Wheat. 636; Gordon *v.* Appeal Tax Court, 3 How. 145; West River Bridge *v.* Dix, 6 How. 531; Planters' Bank of Mississippi *v.* Sharp, 6 How. 326–7; East Hartford *v.* Hartford Bridge Company, 17 Conn. 93; New Jersey *v.* Wilson, 7 Cranch, 164; Fletcher *v.* Peck, 6 Cranch, 88; Terrett *v.* Taylor, 9 Cranch, 43; Town of Pawlett *v.* Clarke, 9 Cranch, 292; Wales *v.* Stetson, 2 Mass. 143; Enfield Toll Bridge *v.* Conn. River Co. 7 Conn. R. 53; McLoren *v.* Pennington, 1 Paige, Ch. R. 107; 2 Kent's Com. 305, 306; Greene *v.* Biddle, 8 Wheat. 1; University of Maryland *v.* Williams, 9 Gill. & Johns. 402; Bayne *v.* Baldwin, 3 Smedes & Marsh. (Miss.) R. 661; Aberdeen Academy *v.* Mayor of Aberdeen, 13 Smedes & Marsh. R. 645; Young *v.* Harrison, 6 Georgia R. 130; Coles *v.* Madison county, Breese (Ill.) Rep. 120; Bush *v.* Shipman, 4 Scam. (Ill.) R. 190; The People *v.* Marshall, 1 Gilman (Ill.) R. 672; State *v.* Hayward, 3 Richardson (S. C.) R. 389; Baily *v.* Railroad Co. 4 Harrington (Del.) R. 389; LeClercq *v.* Gallipolis, 7 Ohio, 217; State *v.* Com'l Bank of Cincinnati, 7 Ohio, 125; State *v.* Wash. Soc. Library, 9 Ohio, 96; Michigan Bank *v.* Hastings, 1 Doug. (Mich.) R. 225; Bank of Pennsylvania *v.* Commonwealth, 19 Pennsylvania Rep. 151; Hardy *v.* Waltham, 9 Pick. 108.

3d. The right of a State to tax the property of a private cor-

poration (such as a bank) or to tax any specified property of private persons may, by legislative contract, be wholly relinquished, commuted, or limited to an agreed amount, and no State law can impair the validity of such contract.

Angell & Ames on Corp. §§ 469–472 inclusive; Gordon v. Appeal Tax Court, 3 How. 133; Gordon's Ex'rs v. Baltimore, 5 Gill, 231; Bank of Cape Fear v. Edwards, 5 Iredell, 516; Bank of Cape Fear v. Deming, 7 Iredell, 516; Union Bank of Tennessee v. State, 9 Yerger, 490; State of New Jersey v. Bury, 2 Harris, 84; Gordon v. State, 1 Zabriskie, 527; Johnson v. Commonwealth, 7 Dana, 342; Bank of Illinois v. The People, 4 Scam. 304; Williams v. Union Bank of Tennessee, 2 Hump. 339; Atwater v. Woodbridge, 6 Conn. 223; Osborne v. Humphrey, 7 Conn. 335; East Hartford v. Hartford Bridge Company, 17 Conn. 93; State v. Com'l Bank of Cincinnati, 7 Ohio Rep. 125.

In the absence of adjudicated cases to establish the right of the legislature of a State thus to relinquish, commute, or limit the amount of taxation, it might and ought to be inferred from the uniformity and extent of its exercise by the States from their earliest history to the present time.

In the case of Briscoe v. Bank of Kentucky, 11 Pet. 318, the court say, "that a uniform course of action involving the right to the exercise of an important power by the State governments for half a century, and this almost without question, is no unsatisfactory evidence that the power is rightly exercised. Cin., Wil. & Zanesville R. R. Co. v. Com'rs. Clinton Co. 21 Ohio Rep. 95.

In accomplishing the lawful purposes of legislation, the choice of means adapted to the end must be left exclusively to the discretion of the legislature, provided the means used are not prohibited by the Constitution. Cin., Wil. & Zanesville R. R. Co. v. Com'rs. Clinton Co., 21 Ohio Rep. 95.

4th. The plaintiff in error claims that by the sixtieth section of the act of 24th of February, 1845, the State, by contract, (and not by legislative command) fixed and agreed upon the time, manner, and amount of taxation to be imposed upon and paid by said bank, which contract is mutually binding on the parties, and cannot be changed or abrogated by either without the consent of the other.

This last proposition involves an interpretation of so much of said law as relates to the subject of taxation in two aspects:

1. Whether the sixtieth section be a contract on the subject of taxation, as claimed by the plaintiff in error, or a law dictating and commanding the amount of taxation, as claimed by the defendant in error.

2. If it be a contract, whether it was temporary and depending on the will of the legislature, or permanent, and to remain in force during the term of the charter.

The court lay down the doctrine in Charles River Bridge *v.* Warren Bridge, 11 Pet. 545, that in the construction of statutes creating corporations, the rules of the common law must govern in this country; and in the same opinion, at page 548, the court say, that the rules of construing a statute which surrenders the taxing power, are the same as those that apply to any other affecting the public interest.

In the case of the Sutton Hospital, Lord Coke lays down the rule of the common law in the construction of charters in the following terms, namely, " That the best exposition of the King's charter is upon the consideration of the whole charter to expound the charter by the charter itself, every material part thereof being explained according to the true and genuine sense, which is the best method." The rule of interpretation is laid down by the Supreme Court in Charles River Bridge *v.* Warren Bridge, 11 Pet. 549. Also, by Judge Story, in his dissenting opinion, at page 600. Also, in case of Richmond Railroad Co. *v.* Louisa Railroad Company, 13 How. 81.

Where a right is not given in express words by the charter, it may be deduced by interpretation, if it is clearly inferrible from some of its provisions. Stourbridge Canal *v.* Wheely, 2 Barn. & Adol. 792; Union Bank of Tennessee *v.* The State, 9 Yerg. 495.

In adopting the rule of expounding the charter by the charter itself, the court is referred to all that part of the act of incorporation which is subsequent to the forty-fifth section.

In construing statutes making grants for private enterprise, it is a settled principle,

1st. That all grants for purposes of this sort are to be construed as contracts between the government and the grantee, and not as mere laws. 11 Pet. 660. Judge Story's opinion.

2d. That they are to receive a reasonable construction. And if from the express words of the act, or just and plain inference from the terms used, the intent can be satisfactorily made out, it is to prevail and be carried into effect. But if the language be ambiguous, or the intent cannot be satisfactorily made out from the terms used, then the act is to be taken most strongly against the grantee and most beneficially to the public. 11 Pet. 600.

The following points made on behalf of the defendant in error, are copied from the brief of Mr. Spalding.

The first section of the " act to tax banks, and bank and other

stocks, the same as other property is now taxable by the laws of this State," passed March 21, 1851, reads as follows :

" That it shall be the duty of the president and cashier of each and every banking institution incorporated by the laws of this State, and having the right to issue bills or notes for circulation, at the time for listing personal property under the laws of this State, to list the capital stock of such banking institution, under oath, at its true value in money, and return the same, with the amount of surplus and contingent fund belonging to such banking institution, to the assessor of the township or ward in which such banking institution is located ; and the amount so returned shall be placed on the grand duplicate of the proper county, (and upon the city duplicate for city taxes, in cases where such city tax does not go upon the grand duplicate, but is collected by the city officers,) and taxed for the same purposes and to the same extent that personal property is or may be required to be taxed in the place where such bank is located ; and such tax shall be collected and paid over in the same manner that taxes on other personal property are required by law to be collected and paid over :. Provided, however, that the capital stock of any bank shall not be returned or taxed for a less amount than its capital stock paid in."

The single question presented in this case is the following :

Has the Legislature of Ohio, in the enactment last recited, impaired the obligation of a contract, within the meaning of the prohibition contained in the tenth section of the first article of the Constitution of the United States ?

I maintain that it has not ; and, in support of my position, respectfully advance, for the consideration of the court, the following propositions :

1st. The act of the General Assembly of the State of Ohio, entitled " An act to incorporate the State Bank of Ohio, and other banking companies," passed February 24, 1845, is not a contract in the sense in which that term is used in the Constitution.

It is a system of rules and regulations prescribed by the law-making power in the State for the government of all the citizens of Ohio who may choose, within certain limits, to embark in the business of banking. It is as mandatory in its character as any law upon the statute book, and some of its mandates are enforced under the severest penalties known to the law. See § 67.

It is susceptible of amendment, and it has been amended, without objection, in its most important features. 46 Ohio Laws, 92 ; 48 Ib. 35. At the time of its enactment, February 24, 1845, there was a general law in force in Ohio, providing that

all subsequent corporations, whether possessing banking powers or not, were to hold their charters subject to alteration, suspension, and repeal, in the discretion of the legislature. Ohio Laws, vol. 40, p. 70. The Bank of Toledo *v.* The City of Toledo, 1 Ohio State Reports, 622, 696.

2d. "With the sole exception of duties on imports and exports, the individual States possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants; and any attempt on the part of the national government to abridge them in the exercise of it would be a violent assumption of power unwarranted by any article or clause of its Constitution." Alexander Hamilton, No. 32, Federalist, p. 140.

3d. The taxing power is of such vital importance, and is so essentially necessary to the very existence of a State government, that its relinquishment cannot be made the subject-matter of a binding contract between the legislature and individuals or corporations. It is a prerogative of sovereignty that must of necessity always be exerted according to present exigencies, and consequently must of necessity continue to be held by each succeeding legislature, undiminished and unimpaired. The Mechanics and Traders Bank *v.* Henry Debolt, 1 Ohio State Rep. 591; Brewster *v.* Hough, 10 New Hamp. Rep. 138; The Providence Bank *v.* Billings, 4 Pet. 514; The Proprietors of the Charles River Bridge *v.* The Proprietors of the Warren Bridge, 11 Pet. Rep. 420, and cases therein cited; The West River Bridge Company *v.* Dix, 6 How. Rep. 507; The Richmond Railroad Company *v.* The Louisa Railroad Company, 13 Howard; 71.

4th. The sixtieth section of the "Act to incorporate the State Bank of Ohio, and other banking companies," passed February 24, 1845, provides only a measure of taxation for the time being, and does not relinquish the right to increase the rate as the future exigencies of the State may require. Debolt *v.* The Ohio Life Insurance and Trust Company, 1 Ohio State Rep. 576; 10 Penn. State Rep. 442; 10 New Hamp. Rep. 138; 13 How. Rep. 71; 9 Georgia Rep. 517; 2 Barn. & Adol. 793; 3 Pet. Rep. 289; Ib. 168, 514; 11 Ib. 544.

5th. The Supreme Court of Ohio has done nothing more than give a construction to a statute law of the State, (the act of 1845,) that is, to say the least, somewhat ambiguous.

By this construction, the act of March 21, 1851, does no violence to the Constitution of the United States. This court is in the habit of adopting the interpretation given by the State courts to the statutes of their own State. Surely it will not, in this instance, undertake to give a construction counter to that of the

State court, when that counter construction will bring subsequent legislation of the State into conflict with the Federal Constitution. 10 Wheat. 159; 11 Ib. 361; 4 Pet. 137; 6 Ib. 291; 16 Ib. 18; 7 How. 40, 219, 818; 13 Ib. 271; 14 Ib. 78, 79.

Upon the 3d point the counsel cited these further authorities: 16 Pet. 281; 8 How. 584; 10 Ib. 402; 4 Comstock, 423; 2 Denio, 474; 5 Cow. 538; 7 Ib. 585; 1 El. & Black. 858.

And read the following extract from Local Laws of Ohio, vol. 43, p. 51:

An act to incorporate the Milan and Richland Plank Road Company, passed January 31, 1845:

SEC. 9. " That in consideration of the expenses which said company will necessarily incur in constructing said road, with the appurtenances thereof, and in keeping the same in repair, the said road and its appurtenances, together with all tolls and profits arising therefrom, are hereby vested in said corporation, and the same shall be forever exempt from any tax, imposition, or assessment whatever."

An act to incorporate the Huron Plank Road Company, passed February 19, 1845. Local Laws, vol. 43d, pp. 111, 114. The ninth section is copied exactly from the ninth section of the Milan and Richland charter.

On the 4th point: 8 How. 581; 9 Ib. 185; 19 Ohio Rep. 110; 1 Ohio State Rep. 313; 4 Wheat. 235; 4. Cranch, 397; 7 How. 279; 10 Ib. 396.

On the 5th point: 5 How. 342.

Mr. Justice McLEAN delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Ohio.

The proceeding was instituted to reverse a decree of that court, entered in behalf of Jacob Knoop, treasurer, against the Piqua Branch of the State Bank of Ohio, for a tax of twelve hundred and sixty-six dollars and sixty-three cents, assessed against the said branch bank for the year 1851.

By the act of 1845, under which this bank was incorporated, any number of individuals, not less than five, were authorized to form banking associations to carry on the business of banking in the State of Ohio, at a place designated; the aggregate amount of capital stock in all the companies not to exceed six millions one hundred and fifty thousand dollars.

In the fifty-first section it is provided that every banking company authorized under the act to carry on the business of banking, whether as a branch of the State Bank of Ohio, or as an independent banking association, "shall be held and adjudged to be a body corporate, with succession, until the 1st of May,

1866 ; and thereafter until its affairs shall be closed." It was made subject to the restrictions of the act.

The fifty-ninth section requires "the directors of each banking company, semiannually, on the first Mondays of May and November, to declare a dividend of so much of the net profits of the company as they shall judge expedient; and on each dividend day the cashier shall make out and verify by oath, a full, clear, and accurate statement of the condition of the company as it shall be on that day, after declaring the dividend, and similar statements shall also be made on the first Mondays of February and August in each year." This statement is required to be transmitted to the auditor of State.

The sixtieth section provides that each banking company under the act, or accepting thereof, and complying with its provisions, shall, semiannually, on the days designated for declaring dividends, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject. The sum so set off to be paid to the treasurer, on the order of the auditor of State.

The Piqua Branch Bank was organized in the year 1847, under the above act; and still continues to carry on the business of banking, and continued to set off and pay the semiannual amount as required; and on the first Mondays of May and November, in 1851, there was set off to the State six per cent. of the profits, deducting expenses and ascertained losses for the six months next preceding each of those days, and the cashier did, within ten days thereafter, inform the auditor of State of the amount so set off on the 15th of November, 1851, the same amounting to $862.50; which sum was paid to the treasurer of State, on the order of the auditor; which payment the bank claims was in lieu of all taxes to which the company or its stockholders were subject for the year 1851.

On the 21st of March, 1851, an act was passed entitled "An act to tax banks and bank and other stocks, the same as property is now taxable by the laws of the State."

This act provides that the capital stock of every banking company incorporated by the laws of the State, and having the right to issue bills or notes for circulation, shall be listed at its true value in money, with the amount of the surplus and contingent fund belonging to such bank; and that the amount of such capital stock, surplus, and contingent fund, should be taxed for the same purposes and to the same extent that personal property was or might be required to be taxed in the place

31 *

where such bank is located; and that such tax should be collected and paid over in the same manner that taxes on other personal property are required by law to be collected and paid over.

In pursuance of this act there was assessed, for the year 1851, on the capital stock, contingent and surplus fund of the Piqua Bank, a tax amounting to the sum of twelve hundred and sixty-six dollars and sixty-three cents. The bank refused to pay this tax on the ground that it was in violation of its charter. Suit was brought by the State against the bank for this tax. The defence set up by the bank was, that the tax imposed was in violation of its charter, which fixed the rate of taxation at six per cent. on its dividends, deducting expenses and losses; but the Supreme Court of the State sustained the act of 1851, against the provision of the charter by which, it is insisted, the contract in the charter was impaired.

We will first consider whether the specific mode of taxation, provided in the sixtieth section of the charter, is a contract.

The operative words are, that the bank shall, "semiannually on the days designated in the fifty-ninth section for declaring dividends, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject."

This sentence is so explicit, that it would seem to be susceptible of but one construction. There is not one word of doubtful meaning when taken singly, or as it stands connected with the sentence in which it is used. Nothing is left to inference. The time, the amount to be set off, the means of ascertaining it, to whom it is to be paid, and the object of the payment, are so clearly stated, that no one who reads the provision can fail to understand it. The payment was to be in lieu of all taxes to which the company or stockholders would otherwise be subject. This is the full measure of taxation on the bank. It is in the place of any other tax which, had it not been for this stipulation, might have been imposed on the company or stockholders.

This construction, I can say, was given to the act by the executive authorities of Ohio, by those who were interested in the bank, and generally by the public, from the time the bank was organized down to the tax law of 1851.

In the case of Debolt v. The Ohio Insurance and Trust Company, 1 Ohio Rep. 563, new series, the Supreme Court, in considering the 60th section now before us, say: "It must be admitted the section contains no language importing a surrender

of the right to alter the taxation prescribed, unless it is to be inferred from the words, 'shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject;' and it is frankly conceded that if these words had occurred in a general law they would not be open to such a construction. If the place where they are found is important, we have already seen this law is general in many of its provisions, and upon a general subject. Why may not this be classed with these provisions, especially in view of the fact, that in its nature it properly belongs there? We think it should be regarded as a law prescribing a rule of taxation, until changed, and not a contract stipulating against any change: à legislative command and not a legislative compact with these institutions." And the court further say, " the taxes required by this act are to be in lieu of other taxes — that is, to take the place of other taxes. What other taxes? The answer is, such as the banks or the stockholders 'would otherwise be subject to pay. The taxes to which they would be otherwise subject were prescribed by existing laws, and this, in effect, operated as a repeal of them, so far as these institutions were concerned.' "

With great respect, it may be suggested there was no general tax law existing, as supposed by the court, under which the banks chartered by the act of 1845 could have been taxed, and on which the above provision could, " in effect, operate to repeal."

The general tax law of the 12th of March, 1831, which raised the tax to five per cent. on dividends, and which operated on all the banks of Ohio, except the " Commercial Bank of Cincinnati," was repealed by the small note act of 1836, and that could operate only on banks doing business at the time of its passage.

The act of the 13th of March, 1838, repealed the act of 1836, so far " as it restricts or prohibits the issuing and circulation of small bills." The act of 1836 authorized the treasurer of State to draw upon the banks for the amount of twenty per cent. upon their dividends, as their proportion of the State tax; and provided that if any bank should relinquish its charter privilege of issuing bills of less denomination than three and five dollars, the tax should be reduced to five per cent. upon its dividends. As the prohibition of circulating small notes was repealed, the tax necessarily fell. Neither the twenty nor the five per cent. could be exacted. The five per cent. was a compromise for the twenty; as the twenty was repealed by the repeal of the prohibition of small notes, neither the one nor the other could be collected.

But if this were not so, the Bank Act of 1842, which imposed

a tax of one half per cent. on the capital stock of the bank, repealed, by its repugnancy, any part of the act of 1836 which, by construction or otherwise, could be considered in force. And the act of 1842 was repealed by the act of 1845. There is a general act in Ohio declaring that the repeal of an act shall not revive any act which had been previously repealed. Swan's Stat. 59.

If this statement be correct, as it is believed to be, the legislature could not have intended, by the special provision in the sixtieth section, to exempt the bank from tax by the existing law, as no such law existed, but to exempt from the operation of tax laws subsequently passed. This is the clear and fair import of the compact, which we think would not be rendered doubtful if a tax law had existed at the time the act of 1845 was passed.

The 60th section is not found in a general law, as is intimated by the Supreme Court of the State. The act of 1845 is general only in the sense, that all banking associations were permitted to organize under it; but the act is as special to each bank as, if no other institution were incorporated by it. We suppose this cannot be controverted by any one. This view is so clear in itself that no illustration can make it clearer.

Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature, where the power to do so is not reserved in the charter. The rate of discount, the duration of the charter, the specific tax agreed to be paid, and other provisions essentially connected with the franchise, and necessary to the business of the bank, cannot, without its consent, become a subject for legislative action.

A municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the legislature. Such is a public corporation, used for public purposes. But a bank, where the stock is owned by individuals, is a private corporation. This was not denied or questioned by the counsel in argument, although it has been controverted in this case elsewhere. But this court and the courts of the different States, not excepting the Supreme Court of Ohio, have so universally held that banks, where the stock is owned by individuals, are private corporations, that no legal fact is susceptible of less doubt. Mr. Justice Story, in his learned and able remarks in the Dartmouth College case, says: "A bank created by the government for its own uses, where the stock is exclusively owned by the government is, in the strictest sense, a public corporation."

" But a bank whose stock is owned by private persons is a

private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine, he says, may be affirmed of insurance, canal, bridge, and turnpike companies. There can be no doubt that these definitions are sound, and are sustained by the settled principles of law."

It by no means follows that because the action of a corporation may be beneficial to the public, therefore it is a public corporation. This may be said of all corporations whose objects are the administration of charities. But these are not public, though incorporated by the legislature, unless their funds belong to the government. Where the property of a corporation is private it gives the same character to the institution; and to this there is no exception. Men who are engaged in banking understand the distinction above stated, and also that privileges granted in private corporations are not a legislative command, but a legislative contract, not liable to be changed.

This fact is shown by the following circumstances: "An act to regulate banking in Ohio," passed the 7th of March, 1842. The 1st section provided. " that all companies or associations of persons desiring to engage in and carry on the business of banking within this State, which may hereafter be incorporated, shall be subject to the rules, regulations, limitations, conditions, and provisions contained in this act, and such other acts to regulate banking as are now in force, or may hereafter be enacted, in this State."

The 20th section of that act provided that a tax of one half per cent. per annum on its capital should be paid, and such other tax upon its capital or circulation as the general assembly may hereafter impose. An amendment to this act was passed the 21st February, 1843; but the act and the amendment remained a dead letter upon the statute book. No stock was subscribed under them, and they were both repealed by the act of 1845, under which nearly three fourths of the banks in Ohio were organized. This act contained the express stipulation that " six per cent. on the dividends, after deducting expenses and losses, should be paid in lieu of all taxes."

This compact was accepted, and on the faith of it fifty banks were organized, which are still in operation. Up to the year 1851, I believe, the banks, the profession, and the bench, considered this as a contract, and binding upon the State and the banks. For more than thirty-five years this mode of taxing the dividends of banks had been sanctioned in the State of Ohio. With few exceptions the banks were so taxed, where any tax on them was imposed. In the case of the State of Ohio *v.* The Commercial Bank of Cincinnati, 10 Ohio Rep. 535, the Supreme

Court of Ohio say, we take it to be well settled, that the charter
of a private corporation is in the nature of a contract between
the State and the corporation. Had there ever been any doubts
upon this subject, those doubts must have been removed by the
decision of the Supreme Court of the United States, in the case
of Woodward *v.* Dartmouth College. And the court remark,
"the general assembly say to such persons as may take the
stock, you may enjoy the privileges of banking, if you will con-
sent to pay to the State of Ohio, for this privilege, four per cent.
on your dividends, as they shall from time to time be made.
The charter is accepted, the stock is subscribed, and the corpo-
ration pays, or is willing to pay, the consideration stipulated, to
wit, the four per cent." And the court say, " here is a contract,
specific in its terms, and easy to be understood." "A contract
between the State and individuals is as obligatory as any other
contract. Until a State is lost to all sense of justice and pro-
priety, she will scrupulously abide by her contracts more scru-
pulously than she will exact their fulfilment by the opposite
contracting party."

This opinion commends itself to the judgment, both on ac-
count of its sound constitutional views and its elevated moral-
ity. It was pronounced at December term, 1835. That decision
was calculated to give confidence to those who were desirous
to make investments in banking operations, or otherwise, in the
State of Ohio.

Ten years after this opinion, and after an ineffectual attempt
had been made by the act of 1842, and its amendment in 1843,
to organize banks in Ohio, without a compact as to taxation,
the act of 1845 was passed, containing a compact much more
specific than that which had been sustained by the Supreme
Court of the State. Under such circumstances, can the inten-
tions of the Legislature of Ohio, in passing the act of 1845, be
doubted, or the inducements of the stockholders to vest their
money under it. Could either have supposed that the 60th sec-
tion proposed a temporary taxation? Such a supposition does
great injustice to the legislature of 1845. It is against the clear
language of the section, which must ever shield them from the
imputation of having acted inconsiderately or in bad faith.
They passed the charter of 1845, which they knew would be
accepted, as it removed the objections to the act of 1842.

Can the compact in the 60th section be " regarded as a law
prescribing a rule of taxation until changed, and not a contract
stipulating against any change; a legislative command, and not
a legislative compact with these institutions?" We cannot but
treat with great respect the language of the highest judicial tri-
bunal of a State, and we would say, that in our opinion it does

not import to be a legislative command ·nor a rule of taxation until changed, but a contract stipulating against any change, from the nature of ·the language used and the circumstances under which it was adopted. According to our views, no other construction can be given to the contract, than that the tax of six per cent. on the dividends is in lieu of all subsequent taxes which might otherwise be imposed; in other words, taxes to which the company or the stockholders would have been liable, had the specific tax on the dividends on the terms stated not been enacted.

In the opinion of the Supreme Court of the State, it is said, the 60th section, in effect, repealed the existing law under which the bank would have been taxed, and that this is the obvious application of the language used; and they add, " that the General Assembly intended only this, and did not intend it to operate upon the sovereign power of the State, or to tie up the hands of their successors, we feel fully assured. To suppose the contrary would be to impeach them of gross violation of public duty, if not usurpation of authority."

So far as regards the effect of the 60th section to repeal existing laws, if no such laws existed, it would follow that no such effect was produced, and we may presume that this was in the knowledge of the legislature of 1845; and in saying that the compact was intended to run with the charter, we only impute to the legislature a full knowledge of their own powers, and the highest regard ·· the public interest. The idea that a State, by exempting from taxation certain property, parts with a portion of its sovereignty, is of modern growth; and so is the argument that if a State may part with this in one instance it may in every other, so as to divest itself of the sovereign power of taxation. Such an argument would be as strong and as conclusive against the exercise of the taxing power. For if the legislature may levy a tax upon property, they may absorb the entire property of the tax-payer. The same may be said of every power where there is·an exercise of judgment.

The Legislature of Ohio passes a statute of limitations·to all civil and criminal actions. Is there no danger that in the exercise of this power it may not ·be abused? Suppose a year, a month, a week, or a day should be fixed as the time within which all actions shall be brought on existing demands, and if not so brought, the remedy should be barred. This is a supposition more probable under circumstances of great embarrassment; when the voice of the debtor is always potent, than that the legislature will inconsiderately exempt property from taxa-

Under a statute of limitation, as supposed, the remedy of the

creditor would be cut off, unless the courts should decide that a limitation to bar the right must be reasonable, but this power could not be exercised under any constitutional provision. It could rest only on the great and immutable principles of justice, unless the time was so short as manifestly to have been intended to impair or destroy the contract. To carry on a government, a more practical view of public duties must be taken.

When the State of Ohio was admitted into the Union by the act of the 30th of April, 1802, it was admitted under a compact that " the lands within the State sold by Congress shall remain exempt from  iy tax laid by or under the authority of the State, whether for  .tate, county, township, or any other purpose whatever, for the term of five years from and after the day of sale." And yet by the same law the State "was admitted into the Union upon the same footing with the original States in all respects whatever."

Now, if this new doctrine of sovereignty be correct, Ohio was not admitted into the Union on the footing of the other sovereign States. Whatever may be considered of such a compact now, it was not held to be objectionable at the time it was made.

The assumption that a State, in exempting certain property from taxation, relinquishes a part of its sovereign power, is unfounded. The taxing power may select its objects of taxation; and this is generally regulated by the amount necessary to answer the purposes of the State. Now the exemption of property from taxation is a question of policy and not of power. A sound currency should be a desirable object to every government; and this in our country is secured generally through the instrumentality of a well-regulated system of banking. To establish such institutions as shall meet the public wants and secure the public confidence, inducements must be held out to capitalists to invest their funds. They must know the rate of interest to be charged by the bank, the time the charter shall run, the liabilities of the company, the rate of taxation, and other privileges necessary to a successful banking operation.

These privileges are proffered by the State, accepted by the stockholders, and in consideration funds are invested in the bank. Here is a contract by the State and the bank, a contract founded upon considerations of policy required by the general interests of the community, a contract protected by the laws of England and America, and by all civilized States where the common or the civil law is established. In Fletcher *v.* Peck, 6 Cranch, 135, Chief Justice Marshall says, " The principle asserted is, that one legislature is competent to repeal any act

which a former legislature was competent to pass, and that one legislature cannot abridge the powers of a succeeding legislature."

"The correctness of this principle," he says, "so far as respects general legislation, can never be controverted. But if an act be done under a law, a succeeding legislature cannot undo it. When, then, a law is in its nature a contract, a repeal of the law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community."

And in another part of the opinion he says, "Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the Constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment, and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the States are obviously founded on this sentiment; and the Constitution of the United States contains what may be deemed a bill of rights for the people of each State."

"No State shall pass any bill of attainder, ex post facto law, or law impairing the obligations of contracts. A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."

In this form he says, "the power of the legislature over the lives and fortunes of individuals is expressly restrained. What motive, then, for implying, in words which import a general prohibition to impair the obligation of contracts, an exception in favor of the right to impair the obligations of those contracts into which the State may enter."

The history of England affords melancholy instances where bills of attainder were prosecuted in parliament to the destruction of the lives and fortunes of some of its most eminent subjects. A knowledge of this caused a prohibition in the Constitution against such a procedure by the States.

In the case of the State of New Jersey v. Wilson, 7 Cranch, 164, it was held, "that a legislative act, declaring that certain lands, which should be purchased for the Indians, should not thereafter be subject to any tax, constituted a contract which could not be rescinded by a subsequent legislative act. Such repealing act being void under that clause of the Constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts."

In 1758 the government of New Jersey purchased the Indians'

title to lands in that State, in consideration of which the government bought a tract of land on which the Indians might reside, an act having previously been passed that "the lands to be purchased for them shall not hereafter be subject to any tax, any law, usage, or custom to the contrary thereof in any wise notwithstanding." The Indians continued in possession of the lands purchased until 1801, when they applied for and obtained an act of the legislature, authorizing a sale of their lands. This act contained no provision in regard to taxation; under it the Indian lands were sold.

In October, 1804, the legislature repealed the act of August, 1758, which exempted these lands from taxes; the lands were then assessed, and the taxes demanded. The court held the repealing law was unconstitutional, as impairing the obligation of the contract, although the land was in the hands of the grantee of the Indians. This case shows that although a State government may make a contract to exempt property from taxation, yet the sovereignty cannot annul that contract.

In the case of Gordon *v.* The Appeal Tax, 3 How. 133, Mr. Justice Wayne, giving the opinion of the court, held, "that the charter of a bank is a franchise, which is not taxable as such, if a price has been paid for it, which the legislature accepted. But that the corporate property of the bank, being separable from the franchise, may be taxed, unless there is a special agreement to the contrary."

And the court say, the language of the eleventh section of the act of 1821 is, "And be it enacted, that upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the State is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act." This, the court say, is the language of grave deliberation, pledging the faith of the State for some purpose, some effectual purpose. Was that purpose the protection of the banks from what that legislature and succeeding legislatures could not do, if the banks accepted the act, or from what they might do in the exercise of the taxing power. The terms and conditions of the act were, that the banks should construct the road and pay annually a designated charge upon their capital stocks, as the price of the prolongation of their franchise of banking. The power of the State to lay any further tax upon the franchise was exhausted. That is the contract between the State and the banks. It follows, then, as a matter of course, when the legislature go out of the contract, proposing to pledge its faith, if the banks shall accept the act not to impose any further tax or burden upon them, that it must have meant by these words an exemption

from some other tax than a further tax upon the franchise of the banks. The latter was already provided against; and the court held that the exemption extended to the respective capital stocks of the banks as an aggregate, and to the stockholders, as persons on account of their stocks. The judgment of the Court of Appeals of Maryland, which sustained the act imposing an additional tax on the banks, was reversed.

It will be observed that the above compact was applied to the stocks of the bank and the interest of the stockholders by construction.

The Supreme Court of Ohio say in relation to this case, that "the power to tax and the right to limit the power were both admitted by counsel, and taken for granted in the consideration of the case; and that a very large consideration had been paid for the extension of the franchise and the exemption of the stock from taxation."

In relation to the admissions of the counsel it may be said that they were men not likely to admit any thing to the prejudice of their clients, which could be successfully opposed; nor would the court, on a constitutional question, rest their judgment on the admissions of counsel. Whether the consideration paid by the banks was large or small, we suppose was not a matter for the court, as the motives or consideration which induced a sovereign State to make a contract, cannot be inquired into as affecting the validity of the act.

In the argument, the case of the Providence Bank v. Billing, was referred to, 4 Peters, 561. This reference impresses me with the shortness and uncertainty of human life. Of all the judges on this bench, when that decision was given, I am the only survivor. From several circumstances the principles of that case were strongly impressed upon my memory; and I was surprised when it was cited in support of the doctrines maintained in the case before us. The principle held in that case was, that where there was no exemption from taxation in the charter, the bank might be taxed. This was the unanimous opinion of the judges, but no one of them doubted that the legislature had the power, in the charter or otherwise, from motives of public policy, to exempt the bank from taxation, or by compact to impose a specific tax on it. And this is clear from the language of the court.

The chief justice in that case says: " that the taxing power is of vital importance, that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be presumed. No one can controvert the correctness of these axioms."

The relinquishment of such a power is never to be presumed; but this implies it may be relinquished, or taxable objects may be exempted, if specially provided for in the charter. And this is still more clearly expressed, as follows: " We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist, that its abandonment ought not to be presumed, in a case in which the deliberate purpose of a State to abandon it does not appear."

Such a case was not then before the court. There was no provision in the Providence Bank charter which exempted it from taxation, and in that case the court could presume no such intention.

But suppose, in the language of that great man, " a consideration sufficiently valuable to induce a partial release of it, and such release had been contained in the charter; would not that have been held sufficient? And of the sufficiency of the consideration, whether it was a bonus paid by the bank, or in supplying a sound currency, the legislature would be the exclusive judges. This would constitute a contract which a legislature could not impair.

The above case is a strong authority against the defendants. The Chief Justice further says, " any privileges which may exempt the corporation from the burdens common to individuals, do not flow necessarily from the charter, but must be expressed in it, or they do not exist." But if so expressed, do they not exist?

A case is cited from the Stourbridge Canal v. Wheely, 2 Barn. & Adol. 793, to show that no implications in favor of chartered rights are admissible. Lord Tenterden says, " that any ambiguity in the terms of the contract must operate against the adventurers, and in favor of the public; and the plaintiffs can claim nothing that is not clearly given them by the act." In the same opinion his lordship said: " Now, it is quite certain that the company have no right expressly to receive any compensation, except the tonnage paid for goods carried through some of the canals or the locks on the canal, or the collateral cuts, and it is therefore incumbent upon them to show that they have a right clearly given by inference from some of the other clauses."

Neither this, the Rhode Island Bank case, nor the Charles River Bridge case, affords any aid to the doctrines maintained, with the single exception, that a right set up under a grant must clearly appear, and cannot be presumed; and this has not been controverted.

That a State has power to make a contract which shall bind it in future, is so universally held by the courts of the United States and of the States, that a general citation of authorities is unnecessary on the subject. Dartmouth College *v.* Woodward, 4 Wheat. 518; Terrett *v.* Taylor, 9 Cranch, 43; Town of Pawlett, 9 Cranch, 292.

Mr. Justice Blackstone says, 2 Bl. Com. 37, " that the same franchise that has before been granted to one, cannot be bestowed on another, because it would prejudice the former grant. In the King *v.* Pasmore, 3 Term, 246, Lord Kenyon says, that an existing corporation cannot have another charter obtruded upon it, or accept the whole or any part of the new charter. The reason of this, it is said, is obvious. A charter is a contract, to the validity of which the consent of both parties is essential, and therefore it cannot be altered or added to without consent."

There is no constitutional objection to the exercise of the power to make a binding contract by a State. It necessarily exists in its sovereignty, and it has been so held by all the courts in this country. A denial of this is a denial of State sovereignty. It takes from the State a power essential to the discharge of its functions as sovereign. If it do not possess this attribute, it could not communicate it to others. There is no power possessed by it more essential than this. Through the instrumentality of contracts, the machinery of the government is carried on. Money is borrowed, and obligations given for payment. Contracts are made with individuals, who give bonds to the State. So in the granting of charters. If there be any force in the argument, it applies to contracts made with individuals, the same as with corporations. But it is said the State cannot barter away any part of its sovereignty. No one ever contended that it could.

A State, in granting privileges to a bank, with a view of affording a sound currency, or of advancing any policy connected with the public interest, exercises its sovereignty, and for a public purpose, of which it is the exclusive judge. Under such circumstances, a contract made for a specific tax, as in the case before us, is binding. This tax continues, although all other banks should be exempted from taxation. Having the power to make the contract, and rights becoming vested under it, it can no more be disregarded nor set aside by a subsequent legislature, than a grant for land. This act, so far from parting with any portion of the sovereignty, is an exercise of it. Can any one deny this power to the legislature? Has it not a right to select the objects of taxation and determine the amount? To deny either of these, is to take away State sovereignty.

33 *

It must be admitted that the State has the sovereign power to do this, and it would have the sovereign power to impair or annul a contract so made, had not the Constitution of the United States inhibited the exercise of such a power. The vague and undefined and indefinable notion, that every exemption from taxation or a specific tax, which withdraws certain objects from the general tax law, affects the sovereignty of the State, is indefensible.

There has been rarely, if ever, it is believed, a tax law passed by any State in the Union, which did not contain some exemptions from general taxation. The act of Ohio of the 25th of March, 1851, in the fifty-eighth section, declared that " the provisions of that act shall not extend to any joint-stock company which now is, or may hereafter be organized, whose charter or act of incorporation shall have guaranteed to such company an exemption from taxation, or has prescribed any other as the exclusive mode of taxing the same." Here is a recognition of the principle now repudiated. In the same act, there are eighteen exemptions from taxation.

The federal government enters into an arrangement with a foreign State for reciprocal duties on imported merchandise, from the one country to the other. Does this affect the sovereign power of either State? The sovereign power in each was exercised in making the compact, and this was done for the mutual advantage of both countries. Whether this be done by treaty, or by law, is immaterial. The compact is made, and it is binding on both countries.

The argument is, and must be, that a sovereign State may make a binding contract with one of its citizens, and, in the exercise of its sovereignty, repudiate it.

The Constitution of the Union, when first adopted, made States subject to the federal judicial power. Could a State, while this power continued, being sued for a debt contracted in its sovereign capacity, have repudiated it in the same capacity? In this respect the Constitution was very properly changed, as no State should be subject to the judicial power generally.

Much stress was laid on the argument, and in the decisions of the Supreme Court, on the fact that the banks paid no bonus for their charters, and that no contract can be binding which is not mutual.

This is a matter which can have no influence in deciding the legal question. The State did not require a bonus, but other requisitions are found in the charter, which the legislature deemed sufficient, and this is not questionable by any other authority. The obligation is as strong on the State, from

the privileges granted and accepted, as if a bonus had been paid.

Another assumption is made, that the banks are taxed as property is taxed in the hands of individuals. No deduction, it appears, is made from banks on account of debts due to depositors or others, whilst debts due by an individual are deducted from his credits. If this be so, it places banks on a very different footing from individuals.

The power of taxation has been compared to that of eminent domain, and it is said, as regards the question before us, they are substantially the same. These powers exist in the same sovereignty, but their exercise involves different principles. Property may be appropriated for public purposes, but it must be paid for. Taxes are assessed on property for the support of the government under a legislative act.

We were not prepared for the position taken by the Supreme Court of Ohio, that "no control over the right of taxation by the States was intended to be conferred upon the General Government by the section referred to, or any other, except in relation to duties upon imports and exports." This has never been pretended by any one. The section referred to gives the federal government no power over taxation by a State. Such an idea does not belong to the case, and the argument used, we submit, is not legitimate. We have power only to deal with contracts under the tenth section of the first article of the Constitution, whether made by a State or an individual; if such contract be impaired by an act of the State such act is void, as the power is prohibited to the State. This is the extent of our jurisdiction. As well might it be contended under the above section that no power was given to the federal government to regulate the numberless internal concerns of a State which are the subjects of contracts. With those concerns we have nothing to do; but when contracts growing out of them are impaired by an act of the State, under the federal Constitution we inquire whether the act complained of is in violation of it.

The rule observed by this court to follow the construction of the statute of the State by its Supreme Court is strongly urged. This is done when we are required to administer the laws of the State. The established construction of a statute of the State is received as a part of the statute. But we are called in the case before us not to carry into effect a law of the State, but to test the validity of such a law by the Constitution of the Union. We are exercising an appellate jurisdiction. The decision of the Supreme Court of the State is before us for revision, and if their construction of the contract in question impairs its obligation, we are required to reverse their judgment. To follow the

construction of a State court in such a case, would be to surrender one of the most important provisions in the federal Constitution.

There is no jurisdiction which we are called to exercise of higher importance, nor one of deeper interest to the people of the States. It is, in the emphatic language of Chief Justice Marshall, a bill of rights to the people of the States, incorporated into the fundamental law of the Union. And whilst we have all the respect for the learning and ability which the opinions of the judges of the Supreme Court of the State command, we are called upon to exercise our own judgments in the case.

In the discussion of the principles of this case, we have not felt ourselves at liberty to indulge in general remarks on the theory of our government. That is a subject which belongs to a convention for the formation of a constitution; and, in a limited view, to the law-making power. Theories depend so much on the qualities of the human mind, and these are so diversified by education and habit as to constitute an unsafe rule for judicial action. Our prosperity, individually and nationally, depends upon a close adherence to the settled rules of law, and especially to the great fundamental law of the Union.

Having considered this case in its legal aspects, as presented in the arguments of counsel, and in the views of the Supreme Court of the State, and especially as regards the rights of the bank under the charter, we are brought to the conclusion, that in the acceptance of the charter, on its terms, and the payment of the capital stock, under an agreement to pay six per cent. semi-annually on the dividends made, deducting expenses and ascertained losses, in lieu of all taxes, a contract was made binding on the State and on the bank; and that the tax law of 1851, under which a higher tax has been assessed on the bank than was stipulated in its charter, impairs the obligation of the contract, which is prohibited by the Constitution of the United States, and, consequently, that the act of 1851, as regards the tax thus imposed, is void. The judgment of the Supreme Court of Ohio, in giving effect to that law, is, therefore, reversed.

Mr. Justice CATRON, Mr. Justice DANIEL, and Mr. Justice CAMPBELL, dissented.

Mr. Chief Justice TANEY gave a separate opinion, as follows:

I concur in the judgment in this case. I think that by the sixtieth section of the act of 1845, the State bound itself by contract to levy no higher tax than the one therein mentioned, upon the banks or stocks in the banks which organized under that law during the continuance of their charters. In my judgment

the words used are too plain to admit of any other construction.

But I do not assent altogether to the principles or reasoning contained in the opinion just delivered. The grounds upon which I hold this contract to be obligatory on the State, will appear in my opinion in the case of the Ohio Life Insurance and Trust Company, also decided at the present term.

Mr. Justice CATRON.

This is a contest between the State of Ohio and a portion of her banking institutions, organized under a general banking law, passed in 1845. She was then a wealthy and prosperous community, and had numerous banks which employed a large capital, and were taxed by the general laws five per cent. on their dividends, being equal to thirty cents on each hundred dollars' worth of stock, supposing it to be at par value. But this was merely a State tax, payable into the State treasury. The old banks were liable to taxes for county purposes, besides; and when located in cities or towns, for corporation taxes also. These two items usually amounted to much more than the State tax.

Such was the condition of Ohio when the general banking law was passed in 1845. By this act, any number of persons not less than five might associate together, by articles, to carry on banking.

The State was laid off into districts, and the law prescribes the amount of stock that may be employed in each. Every county was entitled to one bank, and some to more. Commissioners were appointed to carry the law into effect. It was the duty of this Board of Control to judge of the articles of association, and other matters necessary to put the banks into operation. Any company might elect to become a branch of the State Bank, or to be a separate bank, disconnected with any other. Fifty thousand dollars was the minimum, and five hundred thousand the maximum, that could be employed in any one proposed institution.

By the fifty-first section, each of the banking companies authorized to carry on business was declared to be a body corporate with succession to the first day of May, 1866, with general banking powers; with the privilege to issue notes of one dollar and upwards, to one hundred dollars; and each bank was required to have " on hand in gold and silver coin, or their equivalent, one half at least of which shall be in gold and silver coin in its vault, an amount equal to thirty per cent. of its outstanding notes of circulation ;" and whenever the specie on hand, or its equivalent, shall fall below twenty per cent. of the outstand-

ing notes, then no more notes shall be circulated." The equivalent to specie, meant deposites that might be drawn against in the hands of eastern banks, or bankers of good credit. In this provision constituted the great value of the franchise.

The 59th section declares that semiannual dividends shall be made by each bank of its profits, after deducting expenses; and the 60th section provides, that six per cent. per annum of these profits shall be set off to the State, " which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof on account of stock owned therein, would otherwise be subject." This was equal to thirty-six cents per annum on each hundred dollars of stock subscribed, supposing it to yield six per cent. interest.

By an act of 1851, it was declared that bank stock should be assessed at its true value, and that it should be taxed for State, county, and city purposes, to the same extent that personal property was required to be taxed at the place where the bank was located. As this rate was much more than that prescribed by the 60th section of the act of 1845, the bank before us refused to pay the excess, and suffered herself to be sued by the tax collector, relying on the 60th section, above recited, as an irrepealable contract, which stood protected by the Constitution of the United States.

It is proper to say that the trifling sum in dispute in this cause is the mere ground of raising the question between the State of Ohio and some fifty of her banks, claiming exemption under the act of 1845.

The taxable property of these banks is about eighteen millions of dollars, according to the auditor's report of last year, and which was used on the argument of this cause, by both sides. Of course, the State officers, and other tax payers, assailed the corporations claiming the exemption, and various cases were brought before the Supreme Court of Ohio, drawing in question the validity of the act of 1851 in so far as it increased the taxes of the banks beyond the amount imposed by the 60th section of the act of 1845. The State court sustained the act of 1851, from which decision a writ of error was prosecuted, and the cause brought to this court.

The opinions of the State court have been laid before us, for our consideration; and on our assent or dissent to them, the case depends.

The first question made and decided in the Supreme Court of Ohio was, whether the 60th section of the act of 1845, purported to be in its terms, a contract not further to tax the banks organized under it, during the entire term of their existence? The court held that it imported no such contract; and with this opinion I concur.

The question was examined by the judge who delivered the unanimous opinion of the court, in the case of Debolt v. The Ohio Life Insurance and Trust Company, 1 Ohio State Reports, 564, with a fairness, ability, and learning, calculated to command the respect of all those who have his opinion to review; and which opinion has, as I think, construed the 60th section truly. But, as my brother Campbell has rested his opinion on this section without going beyond it, and as I concur in his views, I will not further examine that question, but adopt his opinion in regard to it.

The next question, decided by the State court is of most grave importance; I give it in the language of the State court: " Had the general assembly power, under the constitution then in force, permanently to surrender, by contract, within the meaning and under the protection of the Constitution of the United States, the right of taxation over any portion of the property of individuals, otherwise subject to it?" On which proposition the court proceeds to remark:

" Our observations and conclusions upon this question, must be taken with reference to the unquestionable facts, that the act of 1851 was a *bonâ fide* attempt to raise revenue by an equal and uniform tax upon property, and contained no covert attack upon the franchises of these institutions. That the surrender did not relate to property granted by the State, so as to make it a part of the grant for which a consideration was paid; the State having granted nothing but the franchise, and the tax being upon nothing but the money of individuals invested in the stock; and that no bonus or gross sum was paid in hand for the surrender, so as to leave it open to controversy, that reasonable taxes, to accrue in future, were paid in advance of their becoming due. What effect a different state of facts might have, we do not stop to inquire. Indeed, if the attempt has here been made, it is a naked release of sovereign power without any consideration or attendant circumstance to give it strength or color; and, so far as we are advised, is the first instance where the rights and interests of the public have been entirely overlooked."

" Under these circumstances, we feel no hesitation in saying the general assembly was incompetent to such a task. This conclusion is drawn from a consideration of the limited authority of that body, and the nature of the power claimed to be abridged.

" That political sovereignty, in its true sense, exists only with the people, and that government is " founded on their sole authority," and subject to be altered, reformed, or abolished only by them, is a political axiom upon which all the American

governments have been based, and is expressly asserted in the bill of rights. Such of the sovereign powers with which they were invested, as they deem necessary for protecting their rights and liberties, and securing their independence, they have delegated to governments created by themselves, to be exercised in such manner and for such purposes as were contemplated in the delegation. That these powers can neither be enlarged or diminished by these repositories of delegated authority, would seem to result, inevitably, from the fundamental maxim referred to, and to be too plain to need argument or illustration.

" If they could be enlarged, government might become absolute; if they could be diminished or abridged, it might be stripped of the attributes indispensable to enable it to accomplish the great purposes for which it was instituted. And, in either event, the constitution would be made, either more or less, than it was when it came from the hands of its authors; being changed and subverted without their action or consent. In the one event its power for evil might be indefinitely enlarged; while in the other its capacity for good might be entirely destroyed; and thus become either an engine of oppression, or an instrument of weakness and pusillanimity.

" The government created by the constitution of this State, (Ohio,) although not of enumerated, is yet one of limited powers. It is true, the grant to the general assembly of " legislative authority" is general; but its exercise within that limit is necessarily restrained by the previous grant of certain powers to the federal government, and by the express limitations to be found in other parts of the instrument. Outside of that boundary, it needed no express limitations, for nothing was granted. Hence this court held, in Cincinnati, Wilmington, &c. R. R. *v.* Clinton Co. 1 Ohio State Rep. 77, that any act passed by the general assembly not falling fairly within the scope of " legislative authority," was as clearly void as though expressly prohibited. So careful was the convention to enforce this principle, and to prevent the enlargement of the granted powers by construction or otherwise, that they expressly declared in art. 8, § 28 — " To guard against the transgression of the high powers we have delegated, we declare that all powers, not hereby delegated, remain with the people." When, therefore, the exercise of any power by that body is questioned, its validity must be determined from the nature of the power, connected with the manner and purpose of its exercise. What, then, is the taxing power? And to what extent, and for what purposes has it been conferred upon the legislature? That it is a power incident to sovereignty — " a power of vital importance to the very existence of every government"— has been as often declared as it has been spoken

of. Its importance is not too strongly represented by Alexander Hamilton, in the 30th number of the Federalist, when he says: " Money is with propriety considered as the vital principle of the body politic; as that which sustains its life and motion, and enables it to perform its most important functions. A complete power, therefore, to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution. From a deficiency in this particular, one of two evils must ensue; either the people must be subjected to continual plunder, as a substitute for a more eligible mode of supplying the public wants, or the government must sink into a fatal atrophy, and in a short course of time perish."

" This power is not to be distinguished, in any particular material to the present inquiry, from the power of eminent domain. Both rest upon the same foundation — both involve the taking of private property — and both, to a limited extent, interfere with the natural right guaranteed by the constitution, of acquiring and enjoying it. But, as this court has already said, in the case referred to, " neither can be classed amongst the independent powers of government, or included in its objects and ends." No government was ever created for the purpose of taking, taxing, or otherwise interfering with the private property of its citizens. " But charged with the accomplishment of great objects necessary to the safety and prosperity of the people, these rights attach as incidents to those objects, and become indispensable means to the attainment of those ends." They can only be called into being to attend the independent powers, and can never be exercised without an existing necessity.

" To sustain this power in the general assembly, would be to violate all the great principles to which I have alluded. It would affirm its right to deal in, and barter away the sovereign right of the State, and thereby, in effect, to change the constitution. When the general assembly of 1845 convened, it found the State in the unquestionable possession of the sovereign right of taxation, for the accomplishment of its lawful objects, extending to ' all the persons and property belonging to the body politic.' "

When its successor convened, in 1846, under the same constitution, and to legislate for the same people, if this defence is available, it found the State shorn of this power over fifteen or twenty millions of property, still within its jurisdiction and protected by its laws. This and each succeeding legislature had the same power to surrender the right, as to any and all other property; until at length the government, deprived of every thing upon which it could operate, to raise the means to attain

its necessary ends, by the exercise of its granted powers, would have worked its own inevitable distruction, beyond all power of remedy, either by the legislature or the people. It is no answer to this to say that confidence must be reposed in the legislative body, that it will not thus abuse the power.

" But, in the language of the court, in McCulloch *v.* Maryland, 4 Wheat. 316, ' is this a case of confidence ? ' "

" For every surrender of the right to tax particular property not only tends to paralyze the government, but involves a direct invasion of the rights of property, of the balance of the community ; since the deficiency thus created must be made up by larger contributions from them, to meet the public demand."

The foregoing are some of the reasonings of the State court on the consideration here involved. With these views I concur, and will add some of my own. The first is, " That acts of parliament derogatory from the power of subsequent legislatures, are not binding. Because, (as Blackstone says,) the legislature being in truth the sovereign power, is always equal, always absolute ; and it acknowledges no superior on earth, which the prior legislature must have been if its ordinances could bind a subsequent parliament. And upon the same principle Cicero, in his letters to Atticus, treats with proper contempt these restraining clauses which endeavor to tie up the hands of succeeding legislatures. When you repeal the law itself, says he, you at the same time repeal the prohibitory clause which guards against repeal.".

If this is so under the British government, how is it in Ohio ? Her Supreme Court holds that the State constitution of 1802 expressly prohibited one legislature from restraining its successors by the indirect means of contracts exempting certain property, from taxation. The court says,— Power to exempt property, was reserved to the people ; they alone could exempt, by an organic law. That is to say, by an amended constitution. The clause mainly relied on declares, " that all powers not delegated, remain with the people." Now it must be admitted that this clause has a meaning ; and it must also be conceded (as I think,) that the Supreme Court of Ohio, has the uncontrollable right to declare what that meaning is ; and that this court has just as little right to question that construction as the Supreme Court of Ohio has to question our construction of the Constitution of United States.

In my judgment the construction of the court of Ohio is proper ; but if I believed otherwise I should at once acquiesce. Let us look at the matter fairly and truly as it is, and see what a different course on part of this court would lead to ; nay, what Ohio is bound to do in self-defence and for self-preservation, under the circumstances.

In 1845 a general banking law is sought at the hands of the legislature, where five dollars in paper can be circulated for every dollar in specie in the bank, or on deposit, in eastern banks or with brokers.    One dollar notes are authorized; every county in the State is entitled to a bank, and the large ones to several; the tempting lure is held out of six per cent. interest on five hundred. dollars for every hundred dollars paid in as stock: thus obtaining a profit of twenty-four dollars on each hundred dollars actually paid in.    That such a bill would have advocates enough to pass it through the legislature, all experience attests; and that the slight tax of thirty-six cents on each hundred dollars' worth of stock, subscribed and paid, was deemed a privilege, when the existing banks and other property were taxed much higher, is plainly manifest.    As was obvious, when the law passed, banks sprang up at once — some fifty in number having a taxable basis last year of about eighteen millions.    The elder and safer banks were, of course, driven out, and new organizations sought under the general law, by the stockholders.    From having constructed large public works, and made great expenditures, Ohio has become indebted so as to require a very burdensome tax on every species of property; this was imposed by the act of 1851, and on demanding from these institutions their equal share, the State is told that they were protected by a contract made with the legislature of 1845, to be exempt from further taxation, and were not bound by the late law, and, of course, they were sued in their own courts.    The Supreme Court holds that by the express terms of the State constitution no such contract could be made by the legislature of 1845, to tie up the hands of the legislature of 1851.    And then the banks come here and ask our protection against this decision, which declares the true meaning of the State constitution.    It expressly guarantees to the people of Ohio the right to assemble, consult, " and instruct their representatives for their common good; " and then " to apply to the legislature for a redress of grievances."    It further declares, that all powers not conferred by that constitution on the legislature are reserved to the people. Now, of what consequence or practical value will these attempted securities be if one legislature can restrain all subsequent ones by contracting away the sovereign power to which instructions could apply ?

The question, whether the people have reserved this right so as to hold it in their own hands, and thereby be enabled to regulate it by instructions to a subsequent legislature, (or by a new constitution,) is a question that has been directly raised only once, in any State of the Union, so far as I know.    In the case of Brewster *v.* Hough, 10 New Hampshire Reports, 139, it

was raised, and Chief Justice Parker, in delivering the opinion of the court in a case in all respects like the one before us, says, " That it is as essential that the public faith should be preserved inviolate as it is that individual grants and contracts should be maintained and enforced. But there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away the essential attributes of sovereignty or rights of eminent domain. These do not seem to furnish the subject-matter of a contract."

This court sustained the principle announced by the Supreme Court of New Hampshire, in the West River Bridge case. A charter for one hundred years, incorporating a bridge company, had been granted; the bridge was built and enjoyed by the company. Then another law was passed authorizing public roads to be laid out, and free bridges to be erected; the commissioners appropriated the West River Bridge and made it free; the Supreme Court of Vermont sustained the proceeding on a review of that decision. And this court held that the first charter was a contract securing the franchises and property in the bridge to the company; but that the first legislature could not cede away the sovereign right of eminent domain, and that the franchises and property could be taken for the uses of free roads and bridges, on compensation being made.

Where the distinction lies, involving a principle, between that case and this, I cannot perceive, as every tax-payer is compensated by the security and comfort government affords. The political necessities for money are constant and more stringent in favor of the right of taxation; its exercise is required daily to sustain the government. But in the essential attributes of sovereignty the right of eminent domain and the right of taxation are not distinguishable.

If the West River Bridge case be sound constitutional law (as I think it is) then it must be true that the Supreme Court of Ohio is right in holding that the legislature of 1845 could not deprive the legislature of 1851 of its sovereign powers or of any part of them.

It is insisted, that the case of the State of Ohio v. The Commercial Bank of Cincinnati, 7 Ohio Rep. 125, has held otherwise. This is clearly a mistake. The State in that case raised no question as to the right of one legislature to cede the sovereign power to a corporation, and tie up the hands of all subsequent legislatures: no such constitutional question entered into the decision; nor is any allusion made to it in the opinion of the court. It merely construed the acts of assembly, and held that a contract did exist on the ground that by the charter the bank was taxed four per cent.; and therefore the charter must

be enforced, as this rate of taxation adhered to the charter, and excluded a higher imposition.

It would be most unfortunate for any court, and especially for this one, to hold that a decision affecting a great constitutional consideration, involving the harmony of the Union, (as this case obviously does,) should be concluded by a decision in a case where the constitutional question was not raised by counsel; and so far from being considered by the court, was never thought of: such a doctrine is altogether inadmissible. And in this connection I will say, that there are two cases decided by this court, (and relied on by the plaintiff in error,) in regard to which similar remarks apply. The first one is that of New Jersey *v.* Wilson, 7 Cranch, 164. An exchange of lands took place in 1758 between the British colony of New Jersey and a small tribe of Indians residing there. The Indians had the land granted to them by an act of the colonial legislature, which exempted it from taxes. They afterwards sold it, and removed. In 1804, the State legislature taxed these lands in the hands of the purchasers; they were proceeded against for the taxes, and a judgment rendered, declaring the act of 1804 valid. In 1812, the judgment was brought before this court, and the case submitted on the part of the plaintiff in error without argument; no one appearing for New Jersey. This court held the British contract with the Indians binding; and, secondly, that it run with the land which was exempt from taxation in the hands of the purchasers.

No question was raised in the Supreme Court of New Jersey, nor decided there, or in this court, as to the constitutional question of one legislature having authority to deprive a succeeding one of sovereign power. The question was not considered, nor does it seem to have been thought of in the State court or here.

The next case is Gordon's case, 3 Howard, 144. What questions were there presented on the part of the State of Maryland, does not appear in the report of the case, but I have turned to them in the record, to see how they were made in the State courts. They are as follows:

"1st. That at the time of passing the general assessment law of 1841, there was no contract existing between the State and the banks, or any of them, or the stockholders therein or any of them, by which any of the banks or stockholders can claim an exemption from the taxation imposed upon them by the said act of 1841."

"2d. That the contract between the State and the old banks, if there be any contract, extends only to an exemption from further 'taxes or burdens,' of the corporate privileges of bank-

34 *

ing; and does not exempt the property, either real or personal, of said banks, or the individual stockholders therein."

"3d. That even if the contract should be construed to exempt the real and personal property of the old banks, and the property of the stockholders therein, yet such exemption does not extend to the new banks, or those chartered since 1830, and, moreover that the power of revocation, in certain cases in these charters, reserves to the State the power of passing the general assessment law."

"4th. That the imposition of a tax of 20 cents upon every one hundred dollars' worth of property; upon both the old and new banks, under the said assessment law, is neither unequal nor oppressive, nor in violation of the bill of rights."

"5th. That taxation upon property within the State, wherever the owners may reside, is not against the bill of rights."

On these legal propositions the opinion here given sets out by declaring that, "The question, however, which this court is called on to decide, and to which our decision will be confined, is — Are the shareholders in the old and new banks, liable to be taxed under the act of 1841, on account of the stock which they own in the banks."

The following paragraph is the one relied on as adjudging the question, that the taxing power may be embodied in a charter and contracted away as private property, to wit: "Such a contract is a limitation on the taxing power of the legislature making it, and upon succeeding legislatures, to impose any further tax on the franchise."

"But why, when bought, as it becomes property, may it not be taxed as land is taxed which has been bought from the State, was repeatedly asked in the course of the argument. The reason is, that every one buys land, subject in his own apprehension to the great law of necessity, that we must contribute from it and all of our property something to maintain the State. But a franchise for banking, when bought, the price is paid for the use of the privilege whilst it lasts, and any tax upon it would substantially be an addition to the price."

As the case came up from the Supreme Court of Maryland, this court had power merely to reëxamine the questions raised in the court below, and decided there. All that is asserted in the opinion beyond this is outside of the case of which this court had jurisdiction, and is only so far to be respected as it is sustained by sound reasoning; but its dicta are not binding as authority; and so the Supreme Court of Maryland held in the case of the Mayor, &c. of Baltimore *v.* The Baltimore and Ohio Railroad Company, 6 Gill, 288.

The State of Maryland merely asked to have her statutes

construed, and if, by their true terms, she had promised to exempt the stockholders of her banks from taxation, then she claimed no tax of them. She took no shelter under constitutional objections, but guardedly avoided doing so.

If an expression of opinion is authority that binds, regardless of the case presented, then we are as well bound the other way, by another quite equal authority. In the case of East Hartford *v.* Hartford Bridge Co. 10 Howard, 535, Mr. Justice Woodbury, delivering the opinion of the court, says : The case of Goszler *v.* The Corporation of Georgetown, 6 Wheat. 596, 598, "appears to settle the principle that a legislative body cannot part with its powers by any proceeding so as not to be able to continue the exercise of them. It can, and should, exercise them again and again, as often as the public interests require." . . . .

"Its members are made, by the people, agents or trustees for them, on this subject, and can possess no authority to sell or grant their power over the trust to others."

The Hartford case was brought here from the Supreme Court of Connecticut, by writ of error, on the ground that East Hartford held a ferry right secured by a legislative act that was a private contract. But this court held, among other things that, by a true construction of the State laws, no such contract existed; so that this case cannot be relied on as binding authority more than Gordon's case. If fair reasoning and clearness of statement are to give any advantage, then the Hartford case has that advantage over Gordon's case.

It is next insisted that the State legislatures have in many instances, and constantly, discriminated among the objects of taxation; and have taxed and exempted according to their discretion. This is most true. But the matter under discussion is aside from the exercise of this undeniable power in the legislature. The question is whether one legislature can, by contract, vest the sovereign power of a right to tax, in a corporation as a franchise, and withhold the same power that legislature had to tax, from all future ones? Can it pass an irrepealable law of exemption?

General principles, however, have little application to the real question before us, which is this: Has the constitution of Ohio withheld from the legislature the authority to grant, by contract with individuals, the sovereign power; and are we bound to hold her constitution to mean as her Supreme Court has construed it to mean? If the decisions in Ohio have settled the question in the affirmative that the sovereign political power is not the subject of an irrepealable contract, then few will be so bold as to deny that it is our duty to conform to the construction they have settled; and the only objection to conform-

ity that I suppose could exist with any one is, that the construction is not settled. How is the fact?

The refusal of some fifty banks to pay their assessed portion of the revenue for the year 1851, raised the question for the first time in the State of Ohio; since then the doctrine has been maintained in various cases, supported unanimously by all the judges of the Supreme Court of that State, in opinions deeply considered, and manifesting a high degree of ability in the judges, as the extract from one of them, above set forth, abundantly shows. If the construction of the State constitution is not settled, it must be owing to the recent date of the decisions. An opinion proceeding on this hypothesis will, as I think, involve our judgment now given in great peril hereafter; for if the courts of Ohio do not recede, but firmly adhere to their construction until the decisions, now existing, gain maturity and strength by time, and the support of other adjudications conforming to them, then it must of necessity occur that this court will be eventually compelled to hold that the construction is settled in Ohio; when it must be followed to avoid conflict between the judicial powers of that State and the Union, an evil that prudence forbids.

1. The result of the foregoing opinion is, that the sixtieth section of the general banking law of 1845 is, in its terms, no contract professing to bind the Legislature of Ohio not to change the mode and amount of taxation on the banks organized under this law; and for this conclusion I rely on the reasons stated by my brother Campbell, in his opinion, with which I concur.

2. That, according to the constitutions of all the States of this Union, and even of the British Parliament, the sovereign political power is not the subject of contract so as to be vested in an irrepealable charter of incorporation, and taken away from, and placed beyond the reach of, future legislatures; that the taxing power is a political power of the highest class, and each successive legislature having vested in it, unimpaired, all the political powers previous legislatures had, is authorized to impose taxes on all property in the State that its constitution does not exempt.

It is undeniably true that one legislature may by a charter of incorporation exempt from taxation the property of the corporation in part, or in whole, and with or without consideration; but this exemption will only last until the necessities of the State require its modification or repeal.

3. But if I am mistaken in both these conclusions, then, I am of opinion that, by the express provisions of the constitution of Ohio, of 1802, the legislature of that State had withheld

from its powers the authority to tie up the hands of subsequent legislatures in the exercise of the powers of taxation, and this opinion rests on judicial authority that this court is bound to follow; the Supreme Court of Ohio having held by various solemn and unanimous decisions, that the political power of taxation was one of those reserved rights intended to be delegated by the people to each successive legislature, and to be exercised alike by every legislature according to the instructions of the people. This being the true meaning of the nineteenth and twenty-eighth sections of the bill of rights, forming part of the constitution of 1802; one section securing the right of instructing representatives, and the other protecting reserved rights held by the people.

Whether this construction given to the State constitution is the proper one, is not a subject of inquiry in this court; it belongs exclusively to the State courts, and can no more be questioned by us than State courts and judges can question our construction of the Constitution of the United States. For these reasons I am of opinion that the judgment of the Supreme Court of Ohio should be affirmed.

Mr. Justice DANIEL.

In the views so clearly taken by my brother Campbell of the character of the legislation of Ohio, impeached by the decision of the court, I entirely coincide. I will add to the objections he has so well urged to the jurisdiction of this court, another, which to my mind at least is satisfactory; it is this, that one of the parties to this controversy being a corporation created by a State, this court can take no cognizance, by the constitution, of the acts, or rights, or pretensions of that corporation.

Mr. Justice CAMPBELL.

I dissent from the opinion of the court.

The question disclosed by the record, is contained in the sixtieth section of an act of the General Assembly of Ohio, " to incorporate the State Bank of Ohio and other banking companies of that State," adopted February, 1845.

The section provides, that every banking company organized by the act, or complying with its provisions, shall semiannually, at designated days, set off to the State, six per cent. of the net profits for the six months next preceding, " which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject;" and the cashier was required to report the amount to the auditor and to pay it to the treasurer; but in computing the profits of the company for the purposes

aforesaid, the interest received on the certificates of the funded debt held by the company, or deposited with and transferred to the treasurer of the State, or to the board of control by such company, shall not be taken into the account." I have extracted the last clause merely because it forms a part of the section.

It is not usual for governments to levy taxes upon the certificates of their funded debt, and Ohio had, in an early statute, forbidden taxation of hers. This clause was a cumulative precaution, wholly unnecessary. Swan Stat. 747, § 5.

The case lies in the solution of the question whether the clause directing the banks to set apart semiannually, upon the profits for the six months preceding, six per cent. in lieu of all other taxes to which the company or the stockholders would otherwise be subject on account of the stock, institutes an unalterable rule of taxation for the whole time of the corporate existence of these banks? The General Assembly of Ohio thinks otherwise, and has imposed a tax upon the stock of the banks, corresponding with the taxes levied upon other personal property held in the State. The payment of this tax has been resisted by the banks. The Supreme Court of Ohio, by its judgment, affirms the validity of the act of the general assembly, and has condemned the bank to the payment. This judgment is the matter of consideration.

The section of the act above cited furnishes a rule of taxation, and while it remains in force a compliance with it relieves the banks from all other taxes to which they would otherwise be subject. Such is the letter of the section.

The question is, has the State of Ohio inhibited herself from adopting any other rule of taxation either for amount or mode of collection, while these banks continue in existence? It is not asserted that such a prohibition has been imposed by the express language of the section. The term for which this rule of taxation is to continue is not plainly declared. The amounts paid according to it discharge the taxes for the antecedent six months. Protection is given in advance of exaction.

The clause in the section, that this " sum or amount, so set off, shall be in lieu of all taxes to which such company or the stockholders thereof would otherwise be subject," requires an addition to ascertain the duration of the rule. It may be completed in adding, " by the existing laws for the taxation of banks," or " till otherwise provided by law," or at " the date of such apportionment or dividend." Or, following the argument of the banks, in adding, " during the existence of the banks." Whether we shall select from the one series of expressions, leading to one result, or the expression leading to another altogether different, depends upon the rules of interpretation applicable to the subject.

The first inquiries are of the relations of the parties to the supposed contract to its subject-matter, and the form in which it has been concluded. The sixtieth section of the act of 1845, was adopted by the General Assembly of Ohio in the exercise of legislative powers, as a part its public law. The powers of that assembly in general, and that of taxation especially, are trust powers, held by them as magistrates, in deposite, to be returned, after a short period, to their constituents without abuse or diminution.

The nature of the legislative authority is inconsistent with an inflexible stationary system of administration. Its office is one of vigilance over the varying wants and changing elements of the association, to the end of ameliorating its condition. Every general assembly is organized with the charge of the legislative powers of the State; each is placed under the same guidance, experience, and observation; and all are forbidden to impress finally and irrevocably their ideas or policy upon the political body. Each, with the aid of an experience, liberal and enlightened, is bound to maintain the State in the command of all the resources and faculties necessary to a full and unshackled self-government. No implication can be favored which convicts a legislature of a departure from this law of its being.

The subject-matter of this section is the contributive share of an important element of the productive capital of the State to the support of its government. The duty of all to make such a contribution in the form of an equal and apportioned taxation, is a consequence of the social organization. The right to enforce it is a sovereign right, stronger than any proprietary claim to property. The amount to be taken, the mode of collection, and the duration of any particular assessment or form of collection, are questions of administration submitted to the discretion of the legislative authority; and variations must frequently occur, according to the mutable conditions, circumstances, or policy of the State. These conditions are regulated for the time, in the sixtieth section of this act. That section comes from the law maker, who ordains that the officers of certain banking corporations, at stated periods, shall set apart from their property a designated sum as their share of the public burden, in lieu of other sums or modes of payment to which they would be subject; but there is no promise that the same authority may not, as it clearly had a right to do, apportion a different rate of contribution. I will not say that a contract may not be contained in a law, but the practice is not to be encouraged, and courts discourage the interpretation which discovers them. A common informer sues for a penalty, or a revenue officer makes a seizure under a promise that on conviction the recovery shall be shared, and yet the State

discharges the forfeiture, or prevents the recovery by a repeal of the law, violating thereby no vested right nor impairing the obligation of any contract. 5 Cranch, 281; 10 Wheat. 246; 6 Pet. 404.

A captor may be deprived of his share of prize-money, pensioners of their promised bounty, at any time before their payment. 2 Russ. & M. 35.

Salaries may be reduced, offices having a definite tenure, though filled, may be abolished, faculties may be withdrawn, the inducements to vest capital impaired and defeated by the varying legislation of a State, without impairing constitutional obligation. 8 How. 163; 10 Ib. 395; 3 Ib. 534; 8 Pet. 88; 2 Sanf. S. C. R. 355. The whole society is under the dominion of law, and acts, which seem independent of its authority, rest upon its toleration. The multifarious interests of a civilized State must be continually subject to the legislative control. General regulations, affecting the public order, or extending to the administrative arrangements of the State, must overrule individual hopes and calculations, though they may have originated in its legislation. It is only when rights have vested under laws that the citizen can claim a protection to them as property. Rights do not vest until all the conditions of the law have been fulfilled with exactitude during its continuance, or a direct engagement has been made, limiting legislative power over and producing an obligation. In this case it may be conceded that at the end of every six months the payment then taken is a discharge for all antecedent liabilities for taxes. That there could be no retrospective legislation. But beyond this the concessions of the section do not extend.

A plain distinction exists between the statutes which create hopes, expectations, faculties, conditions, and those which form contracts. These banks might fairly hope that without a change in the necessities of the State, their quota of taxes would not be increased; and that while payment was punctually made the form of collection would not be altered. But the general assembly represents a sovereign, and as such designated this rule of taxation upon existing considerations of policy, without annexing restraints on its will, or abdicating its prerogative, and consequently was free to modify, alter, or repeal the entire disposition.

I have thus far considered the sixtieth section of the act as a distinct act, embodying a State regulation with the view of ascertaining its precise limitations.

I shall, however, examine the general scheme and object of the act, of which it forms a part, to ascertain whether a different signification can be given to it. Before doing so, it is a matter of consequence to ascertain on what principles the inquiry must be conducted.

Three cases occurred in this court, before either of the members who now compose it belonged to it, in which taxation acts of the States or its municipal authorities, involving questions of great feeling and interest, were pronounced invalid. In the last of these the court said, "that in a society like ours, with one supreme government for national purposes, and numerous State governments for other purposes, in many respects independent and in the uncontrolled exercise of many important powers, occasional interferences ought not to surprise us. The power of taxation is one of the most essential to a State, and one of the most extensive in its operation. The attempt to maintain a rule which shall limit its exercise is undoubtedly among the most delicate and difficult duties which can devolve on those whose province it is to expound the supreme law of the land, in its application to individuals." The court in each of these cases affirm, "that the sovereignty of the State extends to every thing which exists by its authority, or is introduced by its permission, and all on subjects of taxation." 2 Pet. 449; 9 Wheat. 738; 4 Ib. 316.

The limitations imposed by the court in these cases excited a deep and pervading discontent, and must have directed the court to a profound consideration of the question in its various relations. The case of the Providence Bank *v.* Billings, 4 Pet. 514, enabled the court to give a practical illustration of sincerity with which the principle I have quoted was declared. A bank, existing by the authority of a State legislature, claimed an immunity from taxation against the authority of its creator.

The court then said "however absolute the right of an individual (to property) may be, it is still in the nature of that right, that it must bear a portion of the public burdens, and that portion is determined by the legislature." The court declared that the relinquishment of the power of taxation is never to be assumed. "The community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not plainly appear."

These principles were reaffirmed, their sphere enlarged, and their authority placed upon broad and solid foundations of constitutional law and general policy, in the opinion of this court, in the case of the Charles River Bridge, 11 Pet. 420. No opinion of the court more fully satisfied the legal judgment of the country, and consequently none has exercised more influence upon its legislation. The Supreme Court of Pennsylvania, speaking of these cases, says, "they are binding on the State courts not merely as precedents, and therefore proving what the law is, but as the deliberate judgment of that tribunal

with whom the final decision of all such questions rests. The State courts have almost universally followed them. But no tribunal of the Union has acceded to the rule they lay down with a more earnest appreciation of its justice than did this court." 7 Har. 144; 10 Barr, 142.

The Supreme Court of Georgia says, "the decision, based as it is upon a subject particularly within the cognizance and jurisdiction of the Supreme Court of the United States, is entitled to the highest deference." And the eminent Chief Justice of that court adds, "that the proposition it establishes commands my entire assent and approbation." 9 Georgia Rep. 517; 10 N. H. 138; 17 Conn. 454; 21 Verm. 590; 21 Ohio, (McCook's Rep.) 564; 9 Ala. 235; 9 Rob. 324; 4 Coms. 419; 6 Gill, 288.

The chief justice, delivering the opinion of this court in that case, quotes with approbation the principle, that the abandonment of the power of taxation ought not to be presumed in a case in which the deliberate purpose to do so did not appear, and says, " The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to the hands of privileged corporations. The rule of construction announced by the court was not confined to the taxing power; nor is it so limited in the opinion delivered. On the contrary it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished the power in question; and whenever any power of the State is said to be surrendered or diminished, whether it be the taxing power or any other affecting the public interest, the same principle applies, and the rule of construction must be the same."

The court only declared those principles for which the commons of England had struggled for centuries, and which were only established by magnanimous and heroic efforts. The rules that public grants convey nothing by implication, are construed strictly in favor of the sovereign, do not pass any thing not described nor referred to, and when the thing granted is described nothing else passes; that general words shall never be' so construed as to deprive him of a greater amount of revenue than he intended to grant, were not the inventions of the craft of crown lawyers, but were established in contests with crown favorites and impressed upon the administration, executive and judicial as checks for the people. The invention of crown lawyers was employed about such phrases, as *ex speciali gratia, certa scientia mero motu*, and *non obstante*, to undermine the strength of such rules, and to enervate the force of wholesome statutes. A writer of the seventeenth century says, "from the time of William

Rufus, our kings have thought they might alienate and dispose of the crown lands at will and pleasure; and in all ages, not only charters of liberty, but likewise letters-patent for lands and manors, have actually passed in every reign.   Nor would it have been convenient that the prince's hands should have been absolutely bound up by any law, or that what had once got into the crown should have been forever separated from private possession.   For then by forfeitures and attaintures he must have become lord of the whole soil in a long course of time.   The constitution, therefore, seems to have left him free in this matter; but upon this tacit trust, (as he has all his other power,) that he shall do nothing which may tend to the destruction of his subjects.   However, though he be thus trusted, it is only as head of the commonwealth; and the people of England have in no age been wanting to put in their claim to that to which they conceived themselves to have a remaining interest; which claims are the acts of resumption that from time to time have been made in parliament, when such gifts and grants were made as become burdensome and hurtful to the people.   Nor can any government or State divest itself of the means of its own preservation; and if our kings should have had an unlimited power of giving away their whole revenue, and if no authority could have revoked such gifts, every profuse prince, of which we have had many in this kingdom, would have ruined his successor, and the people must have been destroyed with new and repeated taxes; for by our duty we are likewise to support the next prince. So that if no authority could look into this, a nation must be utterly undone without any way of redressing itself, which is against the nature and essence of any free establishment.

Our constitution, therefore, seems to have been, that the king always might make grants, and that these grants, if passed according to the forms prescribed by the law, were valid and pleadable, against not only him, but his successors.   However, it is likewise manifest that the legislative power has had an uncontested right to look into those grants, and to make them void whenever they were thought exorbitant."

Nor were they careless or indifferent to precautionary measures for the preservation of the revenues of the State from spoliation or waste.   Official responsibility was established, and the Lords High Treasurer and Chancellor, through whose offices the grants were to pass, were severally sworn " that they would neither know nor suffer the king's hurt, nor his disheriting, nor that the rights of his crown be distressed by any means as far forth as ye may let; and if ye may not let it, ye shall make knowledge thereof clearly and explicitly to the king with your true advice and counsel."

The responsibility of these high officers, as the history of England abundantly shows, was something more than nominal; nor did the frequent enforcement of that rule of responsibility, nor the adoption by the judges of the stringent rules I have cited, protect the revenues of the State from spoliation. " The wickedness of men," continues this writer, " was either too cunning or too powerful for the wisdom of laws in being. And from time to time great men, ministers, minions, favorites, have broken down the fences contrived and settled in our constitution. They have made a prey of the commonwealth, plumed the prince, and converted to their own use what was intended for the service and preservation of the State. That to obviate this mischief, the legislative authority has interposed with inquiries, accusations, and impeachments, till at last such dangerous heads were reached." ' Davenant's Dis. passim.

Nor let it be said that this history contains no lessons nor instructions suitable to our condition. The discussions before this court in the Indiana Railroad and the Baltimore Railroad cases exposed to us the sly and stealthy arts to which State legislatures are exposed, and the greedy appetites of adventurers, for monopolies and immunities from the State right of government. We cannot close our eyes to their insidious efforts to ignore the fundamental laws and institutions of the States, and to subject the highest popular interests to their central boards of control and directors' management.

This is not the time for the relaxation of those time-honored maxims, under the rule of which free institutions have acquired their reality, and liberty and property their most stable guaranties. The Supreme Court of Pennsylvania says, with great force, " that if acts of incorporation are to be so construed as to make them imply grants of privileges, immunities, and exemptions, which are not expressly given, every company of adventurers may carry what they wish, without letting the legislature know their designs. Charters would be framed in doubtful or ambiguous language, on purpose to deceive those who grant them; and laws, which seem perfectly harmless on their face, and which plain men would suppose to mean no more than what they say, might be converted into engines of infinite mischief. There is no safety to the public interest except in the rule which declares that the privileges not expressly granted are withheld." 7 Harris, 144.

The principles of interpretation, contained in these cases, control the decision of this, if applied to this act. Indeed, the argument of the plaintiff rests upon rules created for, and adapted to, a class of statutes entirely dissimilar. We were invited to consider the antecedent legislation of Ohio, in reference to its

banks, the discouraging effects of that legislation, and then to deal with this act, as a medicinal and curative measure; as an act recognizing past error, and correcting for the future the consequences. It is proper to employ this argument to its just limit. The legislation of Ohio since 1825 certainly manifests a distinct purpose of the State to maintain its powers over these corporations, in the matter of taxation, unimpaired. With a very few exceptions this appears in all the statutes. It is seen in the act of 1825, in the charters granted in 1834, in the acts of 1841–2–3, the two last being acts embracing the whole subject-matter of banking. It is said this austerity was the source of great mischief, depreciated the paper currency of the State, and occasioned distress to the people, and that the change apparent in the act of 1845 was the consequence.

The existence of a consistent and uniform purpose for a long period is admitted. The abandonment of such a purpose, and one so in harmony with sound principles of legislation, cannot be presumed. If the application of these principles in Ohio was productive of mischief, we should have looked for an explicit and unequivocal disclaimer. We have seen that the act contains no renunciation of this important power. And it may be fairly questioned whether the people of Ohio would have sanctioned such a measure. I know of no principle which enables me to treat the sixtieth section of this act as a remedial statute. Even the dissenting opinions in the Charles River and Louisa Railroad cases, which have formed the repertory from which the arguments of the plaintiffs have been derived, do not in terms declare such a rule, and the opinions delivered by the authority of the court repel such a conclusion. Nor can I consider the decision in 7 Ohio R. 125 of consequence in this discussion. That case was decided upon a form of doctrine which after the judgments of this court, before cited, had no title to any place in the legal judgment of the country. The case was decided in advance of the most important and authoritative of those decisions. It is not surprising to hear that the judges who gave the judgment, afterwards renounced its principle, or that another State court has disapproved it, (7 Harris, 144,) or that it has not been followed in kindred cases, 11 Ohio, 12, 393; 19 Ib. 110; 21 Ib. (McCook,) 563, 604, 626; and at the first time when it came up for revision it was overruled.

It remains for me to consider the act of 1845, its purpose and details, in connection with the sixtieth section of the act, to ascertain whether it is proper to assume that the State has relinquished its rights of taxation over the banking capital of the State.

The act of 1845 was designed to enable any number, not

fewer than five persons, to form associations to carry on the business of banking.

The legislature determined the whole amount of the capital which should be employed under the act — that it should be distributed over the State, according to a specified measure of apportionment; that the bills to circulate as currency should have certain marks of uniformity, and be in a certain proportion to capital and specie on hand, and that a collateral security should be given for their redemption. The act contains measures for organization, relating to subscriptions for stock, the appointment of officers and boards of management; sections, of a general interest, referring to the frauds of officers, the insolvency of the corporations, their misdirection and forfeiture; sections containing explicit and clear statements of corporate right and privilege, the capacities they can exercise, the functions they are to perform, and the term of their existence.

. The act initiates a system of banking of which any five of its citizens may avail, and which provides for the confederacy of these associations under the general title of the State Bank of Ohio, and its branches, and their subjection to a board of control, appointed by them.

More than fifty banks have been formed under this act, and thirty-nine belong to the confederacy. Some of the banks over whose charters the State has reserved a plenary control, are by the act permitted to join it. It is said " that the whole of this act is to be taken; the purpose of the act and the time of the act. It is a unit." It will not be contended that the fifty-first section of this act, by which this multitude of banking companies are adjudged to be corporations, with succession for twenty years, places every other relation established by the act, beyond the legislative domain for the same period of time. For there are in the act measures designed for organization and arrangement for the convenience and benefit of the corporators only; there are concessions creating hopes and expectations out of which rights may grow by subsequent events; there are sections which convey present rights, or from which rights may possibly arise in the form of a contract; there are others which enter into the general system of administration, affect the public order, and tend to promote the common security. Some of these provisions may be dispensed with by those for whose exclusive benefit they were made. Some may be altered, modified, or repealed, to meet other conditions of the public interest, and some perhaps may not be alterable except with the consent of the corporators themselves. To determine the class to which one enactment or another belongs, we are referred to those general principles I have already considered. In this act,

of seventy-five sections, which organizes a vast machinery for private banking, which directs the delicate and complex arrangements for the supply of a paper currency to the State, and determines the investment of millions of capital, we find this sixtieth. section. The act is enabling and permissive. It makes it lawful for persons to combine and to conduct business in a particular manner. It forms no partnership for the State, compels no one to embrace or to continue the application of industry and capital according to its scheme. It grants licenses under certain conditions and reservations, but is nowhere coercive. Among the general regulations is the one which directs the banks at the end of every six months to ascertain their net profits for the six months next preceding and to set apart six per cent. for the State in the place of the other taxes or contributions to which they would be liable. But the legislature imposes no limit to its power, nor term to the exercise of its will, nor binds itself to. adhere to this or any other rule of taxation.

The subject affects the public order and general administration. It is not properly a matter for bargain or barter; but the enactment is in the exercise of a sovereign power, comprehending within its scope every individual interest in the State. It is a power which every department of government knows that the community is interested in retaining unimpaired, and that every corporator understood its abandonment ought not to be presumed in a case in which the deliberate purpose to abandon it does not appear."

I have sough in vain in the sixtieth section of the act, in the act itself, and in the legislation and jurisprudence of Ohio, for the expression of such a deliberate purpose.

My opinion is that the Supreme Court of Ohio has faithfully applied the lessons inculcated by this court, and that its judgment should be affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of Ohio, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said Supreme Court of Ohio in this cause be, and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said Supreme Court of Ohio for further proceedings to be had therein in conformity to the opinion of this court.